Filed 1/22/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ELIZABETH M., a Person Coming Under the Juvenile Court Law. | B284123 |
| | (Los Angeles County Super. Ct. No. CK95071) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHAWN M., SR.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Conditionally affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, Kim Nemoy, Principal Deputy Counsel, for Plaintiff and Respondent.

Shawn M., Sr., the father of seven-year-old Shawn M., Jr., six-year-old Michael M., five-year-old Elizabeth M. and four-year-old Gail M., appeals from the order terminating his parental rights to Elizabeth and Gail under Welfare and Institutions Code section 366.26.[1] Shawn contends the court abused its discretion in denying the request of the children's mother, Crystal T., in which he joined, to continue the selection and implementation hearing for Elizabeth and Gail to the new date scheduled for their brothers' hearing; erred in ruling the sibling relationship exception to the legislative preference for adoption (§ 366.26, subd. (c)(1)(B)(v)) did not apply; and failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). We agree there was an inadequate investigation of Crystal's claim of Indian ancestry. Specifically, although the name of the tribe Crystal identified did not directly correspond to that of a federally recognized Indian tribe, the Los Angeles County Department of Children and Family Services failed to satisfy its affirmative obligation to interview family members and others who could be expected to have relevant information concerning the children's status, and the juvenile court failed to ensure an appropriate inquiry had been conducted before concluding ICWA did not apply to these proceedings. Accordingly, we remand the matter to allow the Department and the juvenile court to remedy that violation of federal and state law and otherwise conditionally affirm the order.

---

[1] Statutory references are to this code unless otherwise stated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Dependency Proceedings Prior to the Selection and Implementation Hearing*

The Department filed the original dependency petition in this case in August 2012, prior to Gail's birth, alleging that Shawn had physically abused his older son, then only two years old, by choking him when he failed to stop crying; Crystal had observed the abuse and failed to protect her son; and the two younger children were at substantial risk of suffering physical and emotional harm because of Shawn's abusive behavior and Crystal's fear of Shawn. (§ 300, subds. (a), (b) & (j).) An amended petition added the allegation that Shawn's mental health condition and criminal history also created a risk of harm to the children, and a second amended petition added the allegation that Shawn had struck his younger son with sufficient force to cause bruising. The juvenile court sustained the second amended petition in substantial part, removed the children from the care and custody of their parents, ordered them suitably placed under the supervision of the Department and directed the Department to provide family reunification services to Shawn and Crystal. We affirmed the jurisdiction findings and disposition order in a nonpublished opinion. (*In re Shawn M.* (Sept. 23, 2013, B245323).)

At the six-month review hearing (§ 366.21, subd. (f)) in April 2013, the Department reported the children were placed together in foster care. Several weeks later, following Gail's birth, the Department filed a new dependency petition alleging Gail was at risk because of Shawn's physical abuse of his two sons, Shawn's unresolved mental health issues and Crystal's substance abuse. (Crystal had tested positive for opioids at the

3

time of Gail's birth.)  The petition was sustained in late July 2013 and Gail was removed from the custody of her parents.  The Department was not able to place Gail in the same foster home as her three siblings at that time.  The four children were placed together by April 2014.

Reunification services were terminated for the three older children in July 2014.  Reunification services for Gail were terminated in December 2014, and the case was set for a February 2015 selection and implementation hearing under section 366.26.  In May 2015 the court granted Crystal's petition for modification (§ 388) and returned all four children to Crystal's home under the supervision of the Department.

In February 2016 the Department filed a subsequent petition (§ 342) alleging, in part, that Crystal had physically abused the children.  The children were detained from Crystal, and ultimately the court sustained an amended version of the subsequent petition.  Initially, the girls were placed together in a prospective adoptive home; the boys were placed together in a different home.  By May 2016 the children were moved again. The boys were placed with a prospective adoptive parent, Ms. P. (their sixth placement); the girls were placed together with a prospective adoptive family, Mr. and Mrs. M. (Gail's sixth placement and Elizabeth's eighth).  The court ordered the Department to investigate the home of out-of-state relatives (paternal second cousins in Texas) as a potential placement option for all four children.  The court again scheduled a section 366.26 selection and implementation hearing.

2. *The Selection and Implementation Hearing*

The section 366.26 hearing, scheduled for September 13, 2016, was continued six months to March 9, 2017 for completion

of a home study for Elizabeth and Gail in their current prospective adoptive placement and for identification of an appropriate placement for the two boys. In a last minute information report to the court submitted several days before the hearing, the Department explained the second cousins in Texas had recently stated they were now uncertain whether they were prepared to go forward with adoption or legal guardianship for the children. The report also advised the court that the boys' current caregiver was not interested in adoption.

The March 2017 hearing was continued to April 5, 2017 for an update on efforts to identify an adoptive home for the two boys and for a contested hearing as to the two girls. In its last minute information report the Department indicated the Texas cousins were now prepared to go forward with legal guardianship for all four children, but not adoption. The Department recommended legal guardianship as to the two boys, based on its lack of success in finding an adoptive home for all four children and behavioral issues with the boys. It also recommended that plans for adoption proceed as to the two girls.

At the hearing the Department reported it had located a potential adoptive placement for Shawn, Jr. and Michael. To pursue that possibility and to permit evaluation of the paternal cousins' home in Texas through the Interstate Compact on the Placement of Children (ICPC), and because Shawn, Sr. was incarcerated and had not been transported to court, the court again continued the hearing—first to May 30, 2017 and then again to June 29, 2017. The court also ordered that Elizabeth and Gail were not to be re-placed absent an emergency.

In last minute reports for the June 29, 2017 hearing the Department notified the court that the Texas relatives remained

interested in placement and permanence for the children, but the ICPC evaluation of their home was still pending. A different home with a prospective adoptive placement had been located for the boys; a tentative move to the new residence was scheduled for July 12, 2017. The prospective adoptive parent was aware of a possible relative placement and had acknowledged the relative placement, if found appropriate and ordered by the court, would occur. The home study for the girls' prospective adoptive parents had been approved.

At the June 29, 2017 hearing the Department recommended terminating parental rights for all four children. In response, minors' counsel, who represented all four children, requested a continuance of the hearing as to the two boys because they were not yet in an adoptive placement. She explained, "I do not feel comfortable with making them legal orphans when there is—when their current placement does not have any intent in providing permanence."

At this point one of the paternal cousins, who had come to the hearing from Texas, addressed the court and said he and his wife wanted to adopt all four children and were doing their best to complete the procedures required for them to do so. Counsel for Crystal then requested the court continue the entire matter, so that the ICPC issues could be resolved and the court could address all four children's permanent plan on the same date. Counsel for Shawn, Sr. joined the request.

The court granted the request for a continuance as to Shawn, Jr. and Michael but denied the parents' request to continue the hearing for Elizabeth and Gail, noting they were in a home with an approved adoptive home study and had been in that placement for more than a year. The court stated, "Even if

6

the ICPC were approved for placement at this time with the relatives in Texas, the court would not be inclined to have the children replaced. While the court has continued to consider those relatives for placement, the minors' counsel has already had the court make an order that the children not be replaced." Then, responding to Shawn, Sr.'s comment that he would like all four children placed together with a relative, the court added, "I do understand that. And it's difficult that it's been—that we haven't been successful in getting them placed together at this point. But the girls now have been in this home for over a year, and I think that people need to take that into consideration, too, in terms of their stability and bonding and emotional issues."[2]

Turning to the permanent plan for Elizabeth and Gail, the court stated it was considering the entire contents of its file, with specific reference to the section 366.26 report prepared for the September 2016 hearing and the last minute information report for the court filed earlier that day. No party submitted any additional evidence. Counsel for Crystal argued the court should apply both the parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)) to the preference for termination of parental

---

[2] After continuing the section 366.26 hearing for Shawn, Jr. and Michael to August 14, 2017, the court gave the Department authority to place the two boys with their relatives in Texas if ICPC approval was received prior to the continued court date. On August 14, 2017 the boys' selection and implementation hearing was continued to December 5, 2017. It appears Shawn, Jr. and Michael were placed with their paternal cousins by that date. On December 5, 2017 the section 366.26 hearing was continued to April 19, 2018 to stabilize their placement.

7

rights if a child is likely to be adopted within a reasonable time. Shawn, Sr.'s counsel joined both arguments. Counsel for the Department and minors' counsel argued neither exception applied and urged the court to terminate parental rights as to Elizabeth and Gail. The Department's counsel added it was the Department's position that the four children "should potentially be with the relatives in Texas."

The court found the children adoptable and ruled neither statutory exception to adoption had been established, expressly stating it could not find the sibling relationship outweighed the benefit of permanence in adoption. The court terminated parental rights and directed their counsel to refer Elizabeth and Gail to the Alliance for Children's Rights for finalization of the adoption.

3. *ICWA Notice and Inquiry*

The original dependency petition, filed August 17, 2012, included an Indian Child Inquiry Attachment, Judicial Council form ICWA-010(A), for Shawn, Jr., Michael and Elizabeth, prepared by the Department's social worker, reporting that each child may have Indian ancestry. In addition, on the same date both Shawn, Sr. and Crystal submitted a Judicial Council form ICWA-020, Parental Notification of Indian Status, checking the box stating, "I may have Indian ancestry" and inserting "Redtail" as the tribe's name.[3] In its detention report the Department noted ICWA's potential application to the case but incorrectly asserted, "[M]other indicated that there is no Indian Heritage in

---

[3]     California Rules of Court, rule 5.481(a)(2) requires the court, at the first appearance of a parent in any dependency case, to order the parent to complete Judicial Council form ICWA-020.

8

her family, however, father indicated that [his] family is part Red Tail." At the detention hearing, however, the court correctly observed that both Shawn and Crystal had identified their possible Indian ancestry and ordered the Department to give notice to the "Redtail Tribe," the Bureau of Indian Affairs and the Secretary of the Interior.

On September 7, 2012 the Department sent ICWA notices to the Secretary of the Interior and to the Sacramento Area Director of the Bureau of Indian Affairs (BIA). As it had done in its detention report, the Department's ICWA notices erred in asserting that Crystal was "NOT Indian," while indicating Shawn may be affiliated with the Red Tail tribe. The notices contained no names or other biographical information for any of the children's paternal or maternal relatives other than Crystal and Shawn. No notice was sent directly to a tribe identified as "Red Tail."

The BIA responded on October 9, 2012 that the Department's notice contained insufficient information to determine a tribal affiliation. In a last minute information report to the court for a November 2, 2012 progress hearing, the Department submitted the BIA's response and stated a dependency investigator had reviewed the list of federally recognized tribes, which did not include a Red Tail tribe.[4]

---

[4] The Department's last minute information report stated, "On 10/29/2012, DI Wilson received a correspondence from the United States of America Department of Interior stating the notice received contains insufficient information or limited information to determine Tribal Affiliation. On 10/29/2012, DI Wilson reviewed the list of Indian tribes which did not include a 'Red Tail' tribe."

At the November 2, 2012 progress hearing the court found there was no reason to know Shawn, Jr., Michael and Elizabeth were Indian children as defined by ICWA and ruled ICWA did not apply to the case.

When Gail was detained in May 2013 Crystal filed another ICWA-020 form, again stating she may have Indian ancestry, naming the tribe as "Red Tail Indians."[5] At the detention hearing the court ordered the Department to investigate Crystal's claim but nonetheless found ICWA did not apply at that time, apparently based on the November 2, 2012 ICWA finding as to the other three children, which the Department had noted in its detention report along with its assertion that ICWA did not apply to the case.

Interviewed on June 3, 2013 Crystal reported "she had Red Tail Indian on her father's side of the family but she did not know who it was." Mother told the social worker she had received this information from "grandmother Ms. Boursarrd." (Although not entirely clear from the record, it appears the relative identified is Crystal's grandmother, Gail's great-grandmother.) Nothing in the record suggests the Department ever interviewed Ms. Boursarrd or any of Crystal's other relatives regarding the family's possible Indian ancestry.[6]

---

[5]     The Indian Child Inquiry Attachment, included with the section 300 petition for Gail checked the box stated, "The child has no known Indian ancestry."

[6]     In its jurisdiction/disposition report for Gail, filed on July 22, 2013, the Department stated it had not yet interviewed Ms. Boursarrd concerning the child's possible Indian ancestry through Crystal.

On July 22, 2013, Shawn, Sr. who was incarcerated, filed his new ICWA-020 form in connection with the detention of Gail, once again identifying his possible ancestry as a Red Tail Indian. Shawn added the tribe may have been located in Florida or Louisiana. At a progress hearing on that date, the court ordered the Department to interview Shawn, "including ICWA investigation addressing father's Indian ancestry."

The record does not contain any supplemental report regarding investigation of Crystal or Shawn, Sr.'s possible Indian ancestry although both maternal and paternal relatives were present in court at various proceedings.[7] The section 366.26 report submitted for the September 13, 2016 selection and implementation hearing simply recites that the court had found ICWA did not apply to Shawn, Jr., Michael and Elizabeth on November 2, 2012, and as to Gail on May 8, 2013. Similarly, no further ICWA findings or orders were made by the court at Gail's jurisdiction hearing on July 29, 2013 or thereafter. The June 29, 2017 order terminating Shawn, Sr.'s and Crystal's parental rights as to Elizabeth and Gail does not refer to ICWA.

---

[7]     Specifically, neither the status review report for Gail's six-month review hearing (§ 366.21, subd. (e)) filed on January 13, 2014—the first hearing for her following the disposition hearing—nor the October 17, 2013 and January 13, 2014 reports filed in connection with hearings for the three older children, reflect Shawn, Sr. had been interviewed concerning his Indian ancestry as had been ordered by the court on July 22, 2013. All three reports, however, stated ICWA did not apply.

# DISCUSSION

1. *The Juvenile Court Did Not Abuse Its Discretion in Denying the Request To Continue Elizabeth and Gail's Section 366.26 Hearing*

The juvenile court has the power to "control all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought." (§ 350, subd. (a)(1); see *Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 193.) Continuances are discouraged in dependency cases. (*In re Emily D.* (2015) 234 Cal.App.4th 438, 448; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604.) Nonetheless, the juvenile court may continue a dependency hearing upon a showing of good cause, provided the continuance is not contrary to the interest of the child. (See § 352, subd. (a) ["[N]o continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."]; *In re A.M.* (2008) 164 Cal.App.4th 914, 925.) We review an order denying or granting a continuance for abuse of discretion. (See *Giovanni F.,* at p. 605 [reviewing order denying continuance]; *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481 [reviewing order granting continuance].) "To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in

12

a miscarriage of justice." (*In re Joey G.* (2012) 206 Cal.App.4th 343, 346.)

Here, the juvenile court acknowledged, as a general matter, it was desirable to try to place all four children together and, to that end, it would be preferable to decide the permanency options for all of them at the same time. However, as the court emphasized, the two young girls had been residing in an approved adoptive home for more than one year. Permanency plans for the boys, on the other hand, remained uncertain at the time of the June 29, 2017 selection and implementation hearing. Giving greater weight to the girls' need for stability and maintenance of their emotional bond to their prospective adoptive parents than to the still-hypothetical possibility of placement together with their siblings in Texas, the court concluded delaying the section 366.26 hearing was not in the girls' best interest. That decision was neither arbitrary nor irrational and did not constitute an abuse of discretion.

>  2.  *The Juvenile Court Did Not Err in Ruling Shawn, Sr.*
>     *Had Not Established the Sibling Relationship Exception*
>     *to Termination of Parental Rights*
>     a.  *Governing law and standard of review*

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the court has decided to end parent-child reunification services, the legislative preference is for adoption. (*In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"]; *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["if the child is adoptable . . . adoption is the norm"]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts

have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody"].) When the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies. (§ 366.26, subd. (c)(1)(B); see *Celine R.,* at p. 53 ["court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"]; *In re Matthew C.* (1993) 6 Cal.4th 386, 392 [when child adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

The purpose of the sibling exception is to preserve longstanding sibling relationships that serve as "anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) "To show a substantial interference with a sibling relationship the parent [or sibling granted standing] must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.) The court should consider "the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences

14

or have existing close and strong bonds.  [Citation.]  If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption."  (*Ibid.*; accord, *In re Celine R., supra,* 31 Cal.4th at p. 61.)  "[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings."  (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822; see *Celine R.,* at pp. 49-50.)  "The court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer."  (*L.Y.L.,* at p. 951; accord, *In re D.M.* (2012) 205 Cal.App.4th 283, 293.)

The parent has the burden of proving the statutory exception applies.  (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)  The court's decision a parent has not carried this burden may be based on either or both of two component determinations—whether a beneficial sibling relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child . . . ."  (§ 366.26, subd. (c)(1)(B); see *In re K.P.* (2012) 203 Cal.App.4th 614, 622; *Bailey J.,* at p. 1314.)  When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as

15

a matter of law. (*Breanna S.*, at p. 647; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1528.) When the juvenile court concludes the benefit to the child derived from preserving the sibling relationship is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion. (*In re J.S.* (2017) 10 Cal.App.5th 1071, 1080; see *K.P.,* at pp. 621-622; *Bailey J.,* at pp. 1314-1315.)

> b. *Shawn, Sr. failed to demonstrate the girls'*
> *relationship with their brothers outweighed the*
> *benefits of permanency through adoption*

For the first several years of their lives, the girls were placed with their brothers in foster care. In May 2015—just after Elizabeth's third birthday and Gail's second—all four children were temporarily returned to the custody of their mother. However, from February 2016 until the section 366.26 hearing at the end of June 2017—16 months—the girls had not lived with their brothers.[8] Beyond this minimal information describing when the children had been living together, no evidence was presented concerning the nature or quality of the girls' relationship with their brothers as of the June 2017 selection and

---

[8]     As discussed, Elizabeth was detained from Crystal in August 2012 when she was three months old and placed in foster care with her brothers. Less than a year later Gail, a newborn, was removed from Crystal's custody. Initially, Gail was not placed with her siblings, but the four children were together by April 2014. They remained together in foster care until May 2015 when they were all returned to Crystal's care under the supervision of the Department. When they were again removed from Crystal in February 2016, the two girls were not placed with their brothers.

implementation hearing.  Indeed, counsel for Crystal conceded while arguing for the sibling relationship exception, "[T]hey have been separated for quite some time, and I know, perhaps, there's no existing bond at the moment . . . ."

The evidence before the court certainly did not compel a finding that Elizabeth and Gail had a significant sibling bond with Shawn, Jr. and Michael, let alone that termination of parental rights would substantially interfere with their continuing relationship.  To the contrary, nothing in the record suggested Elizabeth and Gail's relationship with their brothers, whatever it may have been, would be severed if they were adopted by their current caregivers.  (See *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019, disapproved on another ground in *In re S.B.*, *supra*, 46 Cal.4th at 537, fn. 5 [absence of evidence that relationships among siblings would necessarily cease upon termination of parental rights supported juvenile court's conclusion sibling bond exception did not apply].)

Without directly evaluating the extent of any sibling bond that may have existed between Elizabeth and Gail, on the one hand, and their brothers, on the other, the juvenile court concluded, "While the children were placed in the same home as the boys up until 16 months ago, the court cannot find that . . . the sibling relationship outweighs the permanence in adoption." That ruling, which was supported by minors' counsel, was well within the court's broad discretion.  The evidence demonstrated the two girls, who had been in multiple foster placements during their short lives, were now thriving in a stable placement and had developed a strong emotional bond with their current caregivers, who had been approved to adopt them.  In light of the girls' significant interest in maintaining that home, the court was

17

fully justified in finding the sense of security and belonging that adoption would bring outweighed any possible disruption in Elizabeth and Gail's relationship with their brothers, Shawn, Jr. and Michael. (See *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 [application of the sibling relationship exception to termination of parental rights "will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount"]; see also *In re D.M.*, *supra*, 205 Cal.App.4th at p. 293; *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 951.)

3. *The Department Failed To Comply With Its Affirmative Duty To Inquire Whether the Children May Be Indian Children Within the Meaning of ICWA*

a. *The ICWA inquiry and notice requirements*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8 (*Isaiah W.*); *In re W.B.* (2012) 55 Cal.4th 30, 47.) For purposes of ICWA, an "Indian child" is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) [definition of "'Indian child'"] & (8) [definition of "'Indian tribe'"]; see Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

As the California Supreme Court explained in *Isaiah W.*, notice to Indian tribes is central to effectuating ICWA's purpose,

18

enabling a tribe to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the matter.  (*Isaiah W.*, *supra*, 1 Cal.5th at p. 8.)  Notice to the parent or Indian custodian and the Indian child's tribe is required by ICWA in state court proceedings seeking foster care placement or termination of parental rights "where the court knows or has reason to know that an Indian child is involved."  (25 U.S.C. § 1912(a).)  Similarly, California law requires notice to the parent, legal guardian or Indian custodian and the Indian child's tribe in accordance with section 224.2, subdivision (a)(5), if the Department or court "knows or has reason to know that an Indian child is involved" in the proceedings.  (§ 224.3, subd. (d); see *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 649; *In re Michael V.* (2016) 3 Cal.App.5th 225, 232; Cal. Rules of Court, rule 5.481(b)(1) [notice is required "[i]f it is known or there is reason to know that an Indian child is involved in a proceeding listed in rule 5.480," which includes all dependency cases filed under section 300].)[9]

   As this court has discussed in several recent cases, although ICWA itself does not define "reason to know," California

---

[9]   If the court has reason to know an Indian child may be involved in the pending dependency proceeding but the identity of the child's tribe cannot be determined, ICWA requires notice be given to the BIA.  (25 U.S.C. §§ 1903(11), 1912(a); see *Isaiah W.*, *supra*, 1 Cal.5th at p. 8; *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 650, fn. 7.)  California has a similar notice requirement.  (§ 224.2, subd. (a)(4); *Isaiah W.*, at p. 9.)

law, which incorporates and enhances ICWA's requirements,[10] identifies the circumstances that may constitute reason to know the child is an Indian child as including, without limitation, when a person having an interest in the child, including a member of the child's extended family, "provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents or great-grandparents are or were a member of a tribe." (§ 224.3, subd. (b)(1); see *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 650; accord, *In re Michael V.*, *supra*, 3 Cal.App.5th at p. 232.)

In addition, new federal regulations to implement ICWA specify a court has "reason to know" the child is an Indian child if "[a]ny participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child." (25 C.F.R. § 23.107(c)(2).) These regulations apply to section 366.26 hearings to terminate parental rights initiated on or after December 12, 2016, even if the child has been involved in dependency proceedings prior to that date. (25 C.F.R. §§ 23.2, 23.143.)[11]

---

[10] "In 2006, with the passage of Senate Bill No. 678 (2005-2006 Reg. Sess.) (Senate Bill No. 678), the Legislature incorporated ICWA's requirements into California statutory law. (Stats. 2006, ch. 838, § 1, p. 6536.) The primary objective of Senate Bill No. 678 was to increase compliance with ICWA. . . . To accomplish this goal, Senate Bill No. 678 revised and recast several provisions of the Family, Probate, and Welfare and Institutions Codes." (*In re W.B.*, *supra*, 55 Cal.4th at p. 52.)

[11] The new federal regulations apply to any child custody proceeding initiated on or after December 12, 2016. (25 C.F.R.

Judicial Council form ICWA-020, Parental Notification of Indian Status, which the juvenile court must order a parent to complete at his or her first appearance in the dependency proceeding (Cal. Rules of Court, rule 5.481(a)(2)), often provides the court and the child protective agency with the first information "suggesting" or "indicating" the child involved in the proceeding is or may be an Indian child. But the burden of developing that information does not rest primarily with the parents or other members of the child's family. Juvenile courts and child protective agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings . . . ." (§ 224.3, subd. (a); see *Isaiah W.*, *supra*, 1 Cal.5th at pp. 9, 10-11; *In re Michael V.*, *supra*, 3 Cal.App.5th at p. 233.) And once the agency or its social worker has reason to know an Indian child may be involved, the social worker is required, as soon as practicable, to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); *Michael V.*, at p. 233*: In re*

_____

§ 23.143.) A "child-custody proceeding" includes any action, other than an emergency proceeding, that may culminate in foster care placement, termination of parental rights, a preadoptive placement or an adoptive placement. (25 U.S.C. § 1903(1); 25 C.F.R. § 23.2.) "An action that may culminate in one of these four outcomes is considered a separate child-custody proceeding from an action that may culminate in a different one of these four outcomes. There may be several child-custody proceedings involving any given Indian child. Within each child-custody proceeding, there may be several hearings." (25 C.F.R. § 23.2.)

21

*Kadence P.* (2015) 241 Cal.App.4th 1376, 1386; see also Cal. Rules of Court, rule 5.481(a)(4)(A).) "[T]he duty to inquire is triggered by a lesser standard of certainty regarding the minor's Indian child status . . . than is the duty to send formal notice to the Indian tribes." (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1200; see *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 652.)

> b. *The Department did not adequately investigate Crystal's claim of Indian ancestry*

In the two ICWA-020's she filed in August 2012 and May 2013 and then again when she was interviewed in June 2013 following Gail's detention, Crystal reported her family was in part Red Tail Indian. Nonetheless, apparently based solely on the dependency investigator's determination that Red Tail was not a federally recognized tribe, the Department conducted no further investigation of Crystal's possible Indian ancestry; and the juvenile court found that ICWA did not apply to the case.[12] Federal and state law require more.

---

[12] As discussed, at the detention hearing for Shawn, Jr., Michael and Elizabeth, the juvenile court ordered the Department to give notice of both Shawn, Sr. and Crystal's identification of Red Tail ancestry to the BIA. In violation of that order the Department stated in its notice that Crystal had no Indian ancestry. Moreover, without any showing that the information was not reasonably ascertainable, the notice sent to BIA omitted any biographical information concerning the children's maternal and paternal grandparents and great-grandparents, as required by federal and state law. (See 25 C.F.R. former § 23.11(a), (d)(3) (2014); Welf. & Inst. Code, § 224.2, subd. (a)(5)(C); see also *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 651.) Under these circumstances it is hardly surprising the BIA responded that the notice contained insufficient information to determine a tribal affiliation.

To be sure, ICWA applies only to children with the required relationship to a federally recognized tribe.[13] Absent information indicating a child may be a member of, or eligible for membership in, a federally recognized tribe, formal ICWA notice is not required. However, when a parent or other family member has informed a dependency investigator or the juvenile court of the child's possible Indian ancestry, the use of a tribal name that does not correspond to that of a federally recognized tribe—or saying "Indian" but providing no tribal name at all—does not, without more, relieve the child protective agency of its affirmative obligation to interview family members and others who could be expected to have relevant information concerning the child's status or the court of its duty to ensure an appropriate inquiry has been conducted before concluding ICWA does not apply to the case. (See *In re Michael V.*, *supra*, 3 Cal.App.5th at pp. 235-236 [statement by children's mother that she had been told maternal grandmother was "full-blood Indian" with no reference to a specific tribe obligated Department to contact other relatives to inquire if they might have information regarding children's possible Indian ancestry]; cf. *In re Louis S.* (2004) 117 Cal.App.4th 622, 627, 632 [maternal grandmother told social worker she was eligible for membership in the Chiricahua Tribe,

_____

[13]     The BIA does not maintain a publicly available list of all federally recognized Indian tribes. It does publish in the Federal Register an internet address linking to a list of agents designated by federally recognized tribes for service of ICWA notices. (See 82 Fed.Reg. 12986 et seq. (March 8, 2017) [Indian Child Welfare Act; Designated Tribal Agents for Service of Notice]; List of Designated Tribal Agents by Tribal Affiliation (updated 11/28/15) <https://www.bia.gov/bia/ois/dhs> [as of Jan. 22, 2018].)

23

described as a branch of the Apache Tribe; Chiricahua is not a federally recognized tribe; social worker should have determined which branches of the Apache Tribe may have absorbed members of the Chiricahua Tribe].)

Just as notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it. Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's identification of the family's tribal affiliation is not accurate. ICWA and state law place the duty with the child protective agency in the first instance, not the child or his or her parent, to determine whether additional information exists that may link a child with Indian ancestry to a federally recognized tribe. In this case, for example, although there is no federally recognized Red Tail tribe (or, apparently, any other tribe by that specific name), Red Tailed Hawk is one of the seven clans of the Cherokee Nation—a federally recognized tribe.[14] Because the Department neither

---

[14] See Cherokee Nation, *Our Government* <http://www.cherokee.org/Our-Government [as of Jan. 22, 2018]; Cherokee Heritage Documentation Center, *Culture: Clans* <http://cherokeeregistry.com/index.php?option=com_content&view=article&id=23&Itemid=398> [as of Jan. 22, 2018]; *Native Americans of Georgia Cherokee Tribe* <http://www.naogcherokee.com/bird-clan.html> [as of Jan. 22, 2018].)

We advised the parties the court intended to take judicial notice that Red Tailed Hawk was one of the seven clans of the Cherokee Nation and provided them with internet addresses for websites documenting that fact. We now take judicial notice of

24

interviewed the children's great-grandmother concerning their possible Indian ancestry, even though Crystal had said she may have additional information, nor, as far as the record reveals, spoke to anyone else in the family who might have relevant information on this issue, we cannot know whether Elizabeth and Gail have Cherokee ancestry or the overlap between the names Red Tail and Red Tailed Hawk is simply a coincidence.

We acknowledge the court in *In re K.P.* (2009) 175 Cal.App.4th 1, 5 rejected the contention a child protective agency "must investigate any possible affiliation with a tribe which is not federally recognized." That may well be a correct statement of the law in situations in which the child's only possible Indian ancestry relates to a specific tribe known not to be federally recognized (for example, a state-recognized tribe or one of Canada's First Nations bands or communities). In other circumstances, however, when no tribal name has been provided or the name given, although not for a federally recognized tribe, cannot be definitely matched to any other known tribe, as was the case here, the agency must pursue all reasonable investigative leads. That is the teaching of *Isaiah W.*, *supra*, 1 Cal.5th 1, decided by the Supreme Court several years after *In re K.P.*, which emphasized the affirmative and continuing nature of the child protective agencies' duty to inquire whether a child in dependency proceedings may be an Indian child. (*Isaiah W.*, at pp. 9, 10-11.)

Because the Department did not adequately investigate Crystal's claim of Indian ancestry—indeed, other than send a

_____

that information. (See Evid. Code, §§ 452, subd. (h), 459, subds. (a) & (c).)

deficient notice to the Secretary of the Interior and the BIA, which incorrectly stated Crystal had no Indian ancestry, it did not investigate it at all—we remand the matter for the juvenile court to direct the Department to conduct a meaningful inquiry into that claim, including making genuine efforts to locate family members who might have information bearing on Elizabeth and Gail's possible Indian ancestry.[15]  If that investigation produces any additional information substantiating Crystal's claim, notice must be provided to any tribe that is identified or, if the tribe cannot be determined, to the BIA.  The Department thereafter is to notify the court of its actions and file certified mail return receipts for any ICWA notices sent, together with any responses received.  The court shall then determine whether the ICWA inquiry and notice requirements have been satisfied and whether Elizabeth and Gail are Indian children.  If the court finds they are Indian children, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in compliance with ICWA and related California law.  If not, the court's original section 366.26 order remains in effect.  (See *In re Michael V.*, *supra*, 3 Cal.App.5th at p. 236.)

---

[15]      Conscientious adherence to ICWA inquiry and notice requirements is in the best interest of all parties to a dependency case because a violation renders the proceedings, including an adoption following termination of parental rights, vulnerable to collateral attack if the dependent child is, in fact, an Indian child. (See 25 U.S.C. § 1914.)  "'To maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child.'" (*In re D.C.* (2015) 243 Cal.App.4th 41, 63; accord, *In re Breanna S.*, *supra*, 8 Cal.App.5th at pp. 653-654.)

26

**DISPOSITION**

The section 366.26 order of the juvenile court is conditionally affirmed. The matter is remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.