Filed 5/16/23  In re Kailee L. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re KAILEE L., a Person Coming Under the Juvenile Court Law. | B323038 |
| | (Los Angeles County Super. Ct. No. 18CCJP07393EF) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| AIRECA T., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel for Plaintiff and Respondent.

_____

At the selection and implementation hearing the juvenile court found eight-year-old Kailee L. and four-year-old Ka'Darien L. were adoptable; terminated the parental rights of their mother, Aireca T., and their alleged father, Malik L.; identified the children's current caregiver as their prospective adoptive parent; and transferred custody and control of the children to the Los Angeles County Department of Children and Family Services for adoptive planning and placement. Emphasizing Kailee's bond with her nine-year-old sister, Kadareyonna L., who was in a different placement, Aireca contends on appeal that the juvenile court erred in finding she had failed to establish the applicability of the sibling relationship exception to the legislative preference for adoption (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(v)).[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Determination and Termination of Reunification Services*

In June 2020 the juvenile court declared Aireca's six children—then-15-year-old Myeisha T., 13-year-old Airelisah T., 11-year-old A'muria T., seven-year-old Kadareyonna, six-year-old Kailee, and 22-month-old Ka'Darien—dependent children of the court. Several months earlier the court had sustained the

---

[1]     Statutory references are to this code.

2

Department's petition pursuant to section 300, subdivisions (a), (b) and (j), alleging that Malik had physically abused the children and Aireca knew of the physical abuse and failed to protect the children and that Malik and Aireca had a history of domestic violence. The children were removed from parental care and custody;[2] and the court ordered family reunification services for Aireca, including a domestic violence program, parenting classes and individual counseling. No services were ordered for Malik, who denied Aireca's identification of him as the father of Kadareyonna, Kailee and Ka'Darien.

The six-month review hearing (§ 366.21, subd. (e)), which began in January 2021, was not ultimately concluded until a contested hearing, redesignated as a hearing pursuant to section 366.22, was held in August 2021. The court found Aireca's progress toward completing her family reunification case plan had not been substantial; terminated family reunification services, which had been provided for more than 12 months; and scheduled a selection and implementation hearing for Airelisah, Kadareyonna, Kailee and Ka'Darien. The court declined to set a section 366.26 hearing for Myeisha, who wanted to remain in her current placement (where she had been since July 2020) under a permanent placement living arrangement and to finish high school. A home-of-parent/mother order was entered for A'muria.

2. *The Section 366.26 Reports*

As of the August 22, 2022 selection and implementation hearing, Myeisha and Airelisah were placed together with the same resource family (Ms. T.). Kailee and Ka'Darien were placed together with Ms. A., where they had resided since May 2020.

---

[2] The children were initially detained from Aireca in October 2019.

Kadareyonna was in a separate placement with Ms. M., where she had lived since November 2019.

In its report for the hearing the Department recommended adoption as the permanent plan for Kailee and Ka'Darien. Ms. A., their current caregiver, was identified as their prospective adoptive parent. Ms. A., who had known the children since October 2019 when they were originally detained and placed in the care of one of her relatives, also indicated she was willing to adopt Kadareyonna. She confirmed she understood the responsibilities of adoption and was committed to ensuring the safety and well-being of all three children. Kadareyonna's current caregiver, Ms. M., in contrast, was interested only in a legal guardianship as the permanent plan for the child.

In an earlier section 366.26 report (in December 2021) the Department stated Kadareyonna, Kailee and Ka'Darien had a close-knit relationship even though living in two different placements. According to that report, "Children crave the love and affection of each other and constantly ask [the social worker] about siblings during monthly visits. At the end of one visit occurring in September 2021, for example, Kadareyonna and Kailee hugged as they said goodbye. Because of this bond, the Department proposed that Kadareyonna, who was only one year older than her sister Kailee, be moved to Ms. A.'s home for adoption. The court approved and directed the Department to develop a plan for Kadareyonna's transition and re-placement in Ms. A.'s home. Although Kadareyonna and Ms. M. were both initially supportive of Kadareyonna's move, this changed in late 2021; and Ms. M. asked that Kadareyonna remain in her care under a legal guardianship.

4

In its August 2022 report the Department stated Kadareyonna loved her current caregiver (Ms. M.) and felt connected to her and the home. The report continued, "Child wants to reside with current caregiver but feels pressure to decide between mother and caregiver and siblings' caregiver. Child does not want to hurt anyone's feelings but stated she wants to be with her siblings and wants to go home to mother but doesn't want to leave caregiver's home because she loves her and she buys her nice things." The Department recommended legal guardianship as the permanent plan for Kadareyonna.[3]

Several months before the hearing, Aireca had a monitored visit for three hours with all six children at a gaming/play zone facility. According to the Department's report, the children had a good time "and didn't want the visit to end. Siblings Kadareyonna and Kailee began to cry after the visit and gave each other a big hug and said goodbye." An additional visit between Kadareyonna and Kailee took place at a party for Kadareyonna's birthday in May 2022. The social worker noted the children stated they could not be apart "because they love each other so much."

Although seeking to become Kadareyonna's legal guardian, Ms. M. stated she was committed to maintaining the sibling bond among Kadareyonna, Kailee and Ka'Darien. Similarly, Ms. A., although still willing to adopt Kadareyonna, acknowledged the plan for Kadareyonna was now a legal guardianship with Ms. M.

---

[3] In its report the Department explained that Kadareyonna was being treated for ADHD, received wraparound services and was working with a therapist to process trauma: "Child's behavior continues to be sporadic and unable to determine when she has a blowup."

and confirmed her willingness to follow all court orders regarding visitation including overnight visits.

　　3. *The Selection and Implementation Hearing*

At the selection and implementation hearing Aireca's counsel opposed termination of parental rights as to Kailee and Ka'Darien, arguing the Department's reports demonstrated the sibling relationship exception had been established.[4]  Specifically, counsel observed that Kadareyonna had reportedly used the term "bond" to describe her relationship with Kailee and Ka'Darien, and Kailee had stated she enjoyed spending time with Kadareyonna.  In addition, counsel quoted the social worker's observation that the two sisters enjoyed being together at Kadareyonna's birthday party in May 2022 and said they "'can't be apart because they love each other so much.'"  Acknowledging there was evidence the caregivers would facilitate a continuing relationship among these siblings, counsel questioned Ms. A.'s openness to working with Ms. M. and urged the court to find legal guardianship was the more appropriate plan for Kailee and Ka'Darien.

In response the Department conceded that Kailee and Ka'Darien enjoyed the time they spent with their siblings but emphasized that the caregivers had indicated their willingness to continue facilitating the sibling relationship.  Counsel for Kailee and Ka'Darien then advised the court that Kailee wanted to be adopted:  "She considers Ms. A[.] to be her mother and considers placement with Ms. A[.] to be her home."  In addition, as had the Department, counsel stressed that Ms. A. had confirmed her

---

[4]　　Counsel also asserted the beneficial parental relationship exception applied—an argument that has been abandoned on appeal.

continuing willingness to maintain sibling visitation and expressly requested "a consortium referral for sibling visitation post adoption."

The court found Aireca had failed to establish the sibling relationship exception, stating, "I do not find that there is substantial interference with the relationship between these children [that is, Kailee and Ka'Darien] and their older siblings. And any risk of loss of ongoing contact between these children and their siblings is outweighed by the long-term benefit to these children from the permanency and stability of adoption." The court, specifically taking into consideration the request by Ms. A. and minors' counsel for a referral to assist the caregivers in maintaining the sibling bonds, concluded no exception to adoption applied in the case of either child.

Aireca filed a timely notice of appeal.

## DISCUSSION

1. *The Sibling Relationship Exception:  Governing Law and Standard of Review*

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).)  If the court has decided to end parent-child reunification services, the legislative preference is for adoption. (See *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody"].)

When the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination establishes that one of six enumerated exceptions applies. (§ 366.26, subd. (c)(1)(B); see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"]; see also *In re Caden C.* (2021) 11 Cal.5th 614, 630-631 ["if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan"].) The statutory exceptions are applicable only in "exceptional circumstances"; adoption remains the norm. (*In re Caden C.*, at p. 631 ["'[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption'"]; *In re Celine R.*, at p. 53 [same]; see *In re Matthew C.* (1993) 6 Cal.4th 386, 392 [when a child is adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

The sibling relationship exception to termination of parental rights and placement for adoption—one of the six statutory exceptions—applies when the juvenile court concludes there would be "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the

8

child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

"The purpose of the sibling exception is to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.'" (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 781; accord, *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.) "'To show a substantial interference with a sibling relationship the parent [or sibling granted standing] must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship.'" (*In re Elizabeth M.*, at p. 781; accord, *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.)

"The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings." (*In re D.O.* (2016) 247 Cal.App.4th 166, 174; see *In re Celine R., supra*, 31 Cal.4th at p. 55 ["the ultimate question is whether adoption would be detrimental to the adoptive child, not someone else"];[5] *In re*

---

[5] The *Celine R.* Court acknowledged the sibling's relationship with the child was not irrelevant, recognizing that "evidence of the sibling's relationship with the child and, if the sibling is articulate, perhaps of the sibling's views of that relationship, might be relevant as indirect evidence of the effect the adoption

*Naomi P.* (2005) 132 Cal.App.4th 808, 822 ["the concern is the best interests of the child being considered for adoption, not the interests of that child's siblings"].)  "The court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 951; accord, *In re Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 781; *In re D.M.* (2012) 205 Cal.App.4th 283, 293.)

The parent has the burden of proving the statutory exception applies.  (*In re Caden C.*, *supra*, 11 Cal.5th p. 625; *In re Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 781.)  The court's decision a parent has not carried this burden may be based on either or both of two component determinations—whether a beneficial sibling relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In Elizabeth M.*, at pp. 781-782.)

We review the juvenile court's finding the parent has not established the existence of the requisite beneficial relationship under the substantial evidence standard.  (See *In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; cf. *In re R.V.* (2015) 61 Cal.4th 181, 200-201 ["[t]here is, however, no single formulation of the

---

may have on the adoptive child."  (*In re Celine R., supra*, 31 Cal.4th at p. 55.)  Nonetheless, the Court held, "Nothing in the statute suggests the Legislature intended to permit a court to not choose an adoption that is in the adoptive child's best interest because of the possible effect the adoption may have on a sibling." (*Id.* at p. 54.)

10

substantial evidence test for all its applications"; where a party fails to meet its burden on an issue in the juvenile court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the juvenile court could not reasonably reject it"].) When the juvenile court concludes the benefit to the child derived from preserving the sibling relationship is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion. (See *In re Caden C.*, at p. 640; *In re Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 782.)

2. *The Juvenile Court Did Not Err in Finding the Sibling Relationship Exception Did Not Apply*

There seems little doubt a strong sibling relationship exists between nine-year-old Kadareyonna and her only slightly younger sister Kailee, as evidenced by the Department's subsequently abandoned plan to have Kadareyonna moved to Ms. A.'s home for adoption together with Kailee and Ka'Darien and by Kadareyonna and Kailee's tearful embraces at the end of their visits. The record, however, is devoid of any meaningful evidence of the significance or benefit to four-year-old Ka'Darien of his relationship with Kadareyonna or his other, even older siblings.[6] Aireca thus failed to establish even the first element of the sibling relationship exception for her young son.

As for Kailee, the court acted well within its discretion in determining the impact of terminating Aireca's parental rights on Kailee's relationship with Kadareyonna or her other siblings did not outweigh the benefits of being adopted by Ms. A. along with

---

[6] Ka'Darien was one when detained from Aireca in October 2019 and had lived with Kailee in six different placements before the two of them came to Ms. A.'s home in May 2020.

11

her younger brother. Although the two children were six- and five-years-old when detained from Aireca in October 2019, and thus shared their toddler years together, as of the August 22, 2022 hearing, Kadareyonna and Kailee had been living in different placements for more than two years. Yet despite their separation they managed to maintain their positive sibling relationship because of their caregivers' understanding of the importance of allowing them to visit with each other. And while the record indicated that Ms. A. and Ms. M. had a falling out in late 2021 and, apparently as a result, the frequency of visits decreased thereafter,[7] both caregivers expressed their willingness to continue to facilitate sibling visitation following the court's decisions on the appropriate permanent plans for the children.

The juvenile court properly relied on these facts and Ms. A.'s desire to formalize postadoption visitation through a consortium referral in determining Kailee's adoption would not unduly disrupt her relationship with Kadareyonna. (See §§ 366.29, subd. (a) ["When a court, pursuant to Section 366.26, orders that a dependent child be placed for adoption, nothing in the adoption laws of this state shall be construed to prevent the prospective adoptive parent or parents of the child from expressing a willingness to facilitate postadoptive sibling contact. With the consent of the adoptive parent or parents, the court may include in the final adoption order provisions for the adoptive parent or parents to facilitate postadoptive sibling contact"], 16002, subd. (e)(1) [if parental rights are terminated and the

_____

[7] In the approximately 10 months between the caregivers' disagreement and the selection and implementation hearing, Kadareyonna and Kailee had three visits—in December 2021, March 2022 and May 2022.

12

court orders a dependent child to be placed for adoption, the county adoption agency must take certain enumerated steps to facilitate ongoing sibling contact except were the court determines by clear and convincing evidence that sibling interaction would be contrary to the safety or well-being of the child]; *In re D.O.*, *supra*, 247 Cal.App.4th at p. 176 [juvenile court properly considered caregiver's assurance of future sibling visits when determining sibling relationship exception did not apply]; see also *In re Celine R.*, *supra*, 31 Cal.4th at p. 55 ["[w]hen appropriate, court can encourage the adoptive parents to agree to visits among the siblings"].)

Balanced against Aireca's speculative concern that the caregivers might not honor their commitment to maintain postadoptive visitation, the record before the juvenile court demonstrated the long-term significance to Kailee (and to Ka'Darien) of the stability and permanence that adoption afforded. Kailee was bonded to Ms. A., called her "Mom," and expressed through her counsel her desire to be adopted by Ms. A. After experiencing multiple placements (primarily because of Ka'Darien's behavioral issues), Kailee's mental and emotional health had steadily improved under Ms. A.'s two years of care. Moreover, as Aireca has acknowledged, Kailee has a strong sibling relationship with Ka'Darien; and it was to their mutual benefit to remain together. Accordingly, the court's decision to terminate Aireca's parental rights to Ka'Darien and to identify Ms. A. as his prospective adoptive parent reinforced the benefits to Kailee of being adopted by that same individual. (Cf. *In re Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 783 ["The evidence demonstrated the two girls, who had been in multiple foster placements during their short lives, were now thriving in a stable

placement and had developed a strong emotional bond with their current caregivers, who had been approved to adopt them.  In light of the girls' significant interest in maintaining that home, the court was fully justified in finding the sense of security and belonging that adoption would bring outweighed any possible disruption in Elizabeth and Gail's relationship with their brothers, Shawn, Jr., and Michael"].)  It was neither arbitrary nor irrational for the court to conclude this was not one of those rare cases where the very real benefits of adoption did not outweigh any potential detriment the adoptive child might suffer should her sibling relationship with her sister be impaired.  (See *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293 ["'[t]he author of the legislation adding the sibling relationship exception anticipated that 'use of the new exception "will likely be rare,"' meaning 'that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption'"]; *In re D.O.*, *supra*, 247 Cal.App.4th at p. 174 [same].)

## DISPOSITION

The juvenile court's August 22, 2022 orders are affirmed.


PERLUSS, P. J.


We concur:


SEGAL, J.


FEUER, J.

14