Filed 9/16/22  In re Jaylene S. CA2/7

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JAYLENE S., et al., Persons Coming Under the Juvenile Court Law. | B317888 |
| | (Los Angeles County Super. Ct. No. 19CCJP04425) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | **ORDER MODIFYING OPINION; NO CHANGE IN APPELLATE JUDGMENT** |
| Plaintiff and Respondent, | |
| v. | |
| PRICILLANA S., | |
| Defendant and Appellant. | |

THE COURT:

The opinion filed on September 12, 2022 and not certified for publication, is modified as follows:

On page 1: The Los Angeles County Superior Court case number, which appears as DK23650, is replaced with 19CCJP04425.

This order does not change the appellate judgment.

_____
PERLUSS, P. J.          SEGAL, J.
FEUER, J.

2

Filed 9/12/22  In re Jaylene S. CA2/7 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JAYLENE S., et al., Persons Coming Under the Juvenile Court Law. | B317888 |
| _____ | (Los Angeles County Super. Ct. No. DK23650) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
|     Plaintiff and Respondent, | |
|     v. | |
| PRICILLANA S., | |
|     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Reversed with directions in part, conditionally affirmed with directions in part.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey M. Blount, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Pricillana S. appeals from the juvenile court's order terminating her parental rights to her daughters, Jaylene S. and Aliah S, ages eight and three. She argues the juvenile court erred in ruling the parental-benefit exception under Welfare and Institution Code section 366.26, subdivision (c)(1)(B)(i), did not apply to Jaylene.[1] She also argues that, for both daughters, the Department failed to comply—and the juvenile court failed to ensure the Department complied—with the duty of inquiry under the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq. (ICWA) and related California law.

Each of Pricillana's contentions has merit. Therefore, we reverse the court's order terminating Pricillana's parental rights to Jaylene and direct the court to conduct a proper analysis under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), decided eight months before the court terminated Pricillana's parental rights, whether the parental-benefit exception applies to Jaylene. We also conditionally affirm the order terminating Pricillana's parental rights to Aliya and direct the juvenile court to ensure the Department complies with its duty of inquiry and if

_____

[1] Statutory references are to the Welfare and Institutions Code.

2

necessary, the notice provisions under ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Juvenile Court Detains Jaylene and Aliah and Sustains a Petition Under Section 300*

Pricillana has four children: two sons,[2] Jaylene, and Aliah. Shortly after Aliah was born, the Department received a referral stating that at the hospital Pricillana and Aliah tested positive for methamphetamine and that Pricillana also tested positive for amphetamine. The Department filed a request with the juvenile court for an order removing Aliah and Jaylene from Pricillana. The court granted the request to remove Aliah, but denied the request to remove Jaylene.

The Department filed a petition under section 300, subdivision (b)(1), alleging there was a substantial risk Jaylene and Aliah would suffer serious physical harm because Pricillana had a long history of using methamphetamine, including recent use that caused the positive toxicology screens at the hospital.[3] Prior to the jurisdiction hearing, the Department reported that

---

[2]    The juvenile court in a different action declared Pricillana's two sons dependent children of the court. When the Department filed the petition in this action, Pricillana's father was the legal guardian of her younger son, and Pricillana's older son was an adult. The sons are not involved in this appeal.

[3]    The Department separately alleged Jaylene was a person described by subdivisions (b)(1) and (j) because of conduct by her father, Jack, which the juvenile court sustained. Jack is not a party to this appeal.

Pricillana failed to appear for multiple scheduled drug tests and had not promptly sought medical attention for Jaylene after Jaylene developed a skin condition. The Department's report prompted the court to remove Jaylene from Pricillana and order her to be suitably placed under the supervision of the Department. At the combined jurisdiction and disposition hearing, Pricillana pleaded no contest to an amended petition, which the court sustained. The court declared Jaylene and Aliah dependent children of the court under section 300, ordered them to remain suitably placed under the supervision of the Department, and ordered family reunification services and monitored visitation for Pricillana.

> B. *Pricillana Visits Her Children, but Fails To Complete Court-ordered Programs*

The Department placed Jaylene and Aliah in the home of the same caregiver. In a status report filed for the six-month review hearing under section 366.21, subdivision (e), a social worker for the Department reported that Jaylene was adapting well to the caregiver's home, but that she had "expressed that she misses her mother" and "wants to go home." Aliah, on the other hand, had developed a "strong" and "loving" connection with the caregiver. Pricillana had been visiting the children, but the visits were "sporadic" and not "consistent." The social worker reported that, when Pricillana visited the children, she was "lovable," "caring," "affectionate," and had a "positive attitude" and that Jaylene was "always happy to see" Pricillana and did not want to leave her. But Pricillana did not complete any court-ordered programs and continued to miss scheduled drug tests.

4

In April 2020 the Department determined the COVID-19 pandemic prevented Pricillana from safely visiting her children in person and amended her visitation rights to allow only virtual visits and phone calls.[4] During subsequent interviews with Department social workers, Jaylene and her caregiver reported that Pricillana participated in some, but not all, of the scheduled calls. During one interview Jaylene said: "I want to talk to my mommy. I miss her." During another, the social worker asked Jaylene whether she had been having tantrums, to which Jaylene responded: "Yes, because I miss my mommy . . . and I want to see her."

In a report for a subsequent review hearing, a Department social worker stated that Pricillana had been participating in her scheduled, daily calls with the girls "accordingly," but that she missed one or two calls per week. Pricillana was still not participating in court-ordered programs. At the continued six-month review hearing the court found Pricillana had not made substantial progress toward alleviating or mitigating the causes that necessitated placement and set a 12-month review hearing under section 366.21, subdivision (f).

In a status report filed for the 12-month review hearing, a Department social worker stated that, although Pricillana had "not been in compliance with the court order[ed] programs," she had "been consistent with all of her virtual visits and daily telephone conversations" with the children and that Jaylene enjoyed the calls. Jaylene had also "expressed that she misses her mother" and that "she wants to go home," and on "several

---

[4] Pricillana filed a motion to resume in-person visits at the home of her father (the children's maternal grandfather), which the court denied.

occasions [Jaylene] had a hard time understanding" why she could not return to her mother. At the hearing the court terminated reunification services for Pricillana and set a selection and implementation hearing under section 366.26.

In a report for the selection and implementation hearing, a Department social worker stated that Aliah had developed a strong connection to the caregiver, but that Jaylene, "due [to] her early relationship with" her mother, had "been a little more difficult . . . ." The caregiver reported that Pricillana had missed some recent in-person visits but attended others and that she "continues virtual visits with both girls . . . ." The caregiver also reported that Jaylene "looks forward to the visits" with Pricillana, that Pricillana "does her best to entertain Jaylene during the visits," and that Jaylene was disappointed and sad when Pricillana missed scheduled visits. In an addendum report, a social worker reported that Jaylene said she did "not want to get adopted" and wanted "to go home with her mother." A social worker later reported that Jaylene, when asked whether she wanted her caregiver to adopt her, stated: "Sometimes, I always want to stay here, but I also want to live with my mom." Jaylene also said adoption was both "sad" and "happy": sad because she could not live with her mom, but happy because she could "stay here."

C. *The Court Denies Pricillana's Request To Apply the Parental-benefit Exception and Terminates Her Parental Rights*

At the selection and implementation hearing, counsel for Pricillana asked the court not to terminate Pricillana's parental rights, arguing the parental benefit exception under section

6

366.26, subdivision (c)(1)(b)(i), applied. Counsel for Jaylene argued the exception did not apply. Counsel for Jaylene, conceding that Pricillana had visited Jaylene, that Jaylene "does enjoy spending time with her mother," that Jaylene became "very upset" when Pricillana did not visit, and that remaining in contact with Pricillana and her family was "important" to Jaylene, argued Pricillana was "no longer taking on a parental role" and could not "provide the stability that's needed." Counsel for the Department joined counsel for Jaylene's argument.

The juvenile court stated that, "although [Pricillana] has been visiting on a somewhat inconsistent basis, the court does not find that the parental bond exception applies in this case as the mother has not taken on a parental role for the children, and the evidence does not indicate that the bond is such to warrant applying the exception." The court terminated Pricillana's parental rights, ordered that the children be placed for adoption, and designated the children's caregiver as their prospective adoptive parent. Pricillana timely appealed.

## DISCUSSION

### A. *The Court Erred in Determining Whether the Parental-benefit Exception Applied*

#### 1. *Applicable Law and Standard of Review*

The purpose of a hearing under section 366.26 is "'to select and implement a permanent plan for the child'" after the juvenile court has terminated reunification services. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see *In re D.M.* (2021) 71 Cal.App.5th 261, 268.) If the court determines "the child is likely to be adopted,"

7

the court "shall terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B), (4)(A).)

One of those reasons is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) To show the exception applies, "the moving parent must establish, by a preponderance of the evidence, each of the following elements: (1) that the parent has regularly visited with the child; (2) that the child would benefit from continuing the relationship; and (3) that terminating the relationship would be detrimental to the child." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*); see *Caden C., supra*, 11 Cal.5th at p. 629.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151.) To establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636; see *Katherine J., supra*, 75 Cal.App.5th at pp. 316-317; *In re J.D.* (2021) 70 Cal.App.5th 833, 852.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'"

8

(*Caden C.*, at p. 632; see *Katherine J.*, at p. 317; *J.D.*, at p. 854.) In assessing the attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632; see *Katherine J.*, at p. 317; *J.D.*, at p. 854.)

For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1151.) "In each case," the court must decide "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' . . . When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, at pp. 633-634; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 317; *A.L.*, at p. 1152.)

Because "whether the parent has visited and maintained contact with the child 'consistently'" and "whether the relationship is such that the child would benefit from continuing it" are factual determinations, a "substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at p. 639; see *In re D.P.* (2022) 76 Cal.App.5th 153, 165.) "The third element—whether termination of parental

9

rights would be detrimental to the child—is somewhat different." (*Caden C.*, at p. 640.) The juvenile court "must make a series of factual determinations," which also "are properly reviewed for substantial evidence." (*Ibid*.) But the court also "makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision . . . is discretionary and properly reviewed for abuse of discretion." (*Ibid*; see *Katherine J., supra*, 75 Cal.App.5th at p. 318.)

### 2. *The Juvenile Court Erred in Analyzing the Second* Caden C. *Element*

Pricillana contends the juvenile court correctly found she established the first element—that she regularly visited Jaylene—but did not properly analyze the second element—whether Jaylene would benefit from continuing the relationship with Pricillana. We start with the first element.

As discussed, the juvenile court stated: "Although [Pricillana] has been visiting on a somewhat inconsistent basis, the court does not find that the parental bond exception applies." Pricillana argues the context of the court's statement shows it misspoke when using the term "inconsistent" (or the court reporter transcribed the word incorrectly). She contends that, when the court used the subordinating conjunction "although" before the statement about visitation and the ruling the parental benefit exception did not apply, "what the court was intending to say was that [Pricillana] had been visiting somewhat *consistently*." (Italics added.) The Department does not take a position on what the court meant by this statement, but argues we should affirm whatever the court's ruling was on the first

10

element because "any . . . finding of regular visitation would have been against the weight of the evidence."

The court's finding on the first element was ambiguous. The court's use of the term "although" suggests the court believed there was at least some evidence supporting a finding Pricillana regularly visited Jaylene. Nor, contrary to the Department's assertion, would such a finding have been against the weight of the evidence (and would have been supported by substantial evidence). Each of the Department's reports indicated Pricillana continued to visit or call Jaylene. Sometimes the visits and calls were "sporadic" or inconsistent, particularly in the months immediately after the Department placed Jaylene in a new home and after the COVID-19 pandemic began. At other times, however, the Department reported the visits and calls were quite consistent. For example, the Department reported for the 12-month review hearing that Pricillana was "consistent with all of her virtual visits"—the only type of visits the Department allowed for several months—as well as with her "daily telephone conversations." (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 ["The question is just whether 'parents visit consistently,' taking into account "the extent permitted by court orders."].) In another report the Department stated that Pricillana generally participated in daily scheduled calls with the girls and that she missed only one or two per week. In the Department's final adoption assessment filed before the selection and implementation hearing, the Department stated Pricillana had 36 visits with the girls during the previous six months, which works out to an average of one to two times a week. While Pricillana did not take advantage of every opportunity she had to see Jaylene, there was substantial evidence to support a finding

11

Pricillana visited her consistently.  (See *In re D.M.*,
*supra*, 71 Cal.App.5th at p. 270 [substantial evidence supported
the finding the father visited consistently because, "[w]hile
father's visitation was not perfect, father regularly visited the
children over the course of the years-long dependency"].)

On the second element, Pricillana contends the court
"applied an incorrect legal standard that required performance of
a parental role."  She is correct.  As *Caden C.* made clear, the
proper inquiry under the second element is whether "the child
would benefit from continuing the relationship" (*Caden C.*, *supra*,
11 Cal.5th at p. 632), not whether the parent has taken on a
"parental role."  As stated, the juvenile court should focus on the
child's age, the amount of time the child spent living with the
parent, the quality of the interaction between the child and the
parent, and the child's needs.  (*Ibid.*)  There is no indication that,
in finding Pricillana had not taken on a "parental role," the court
considered any of these factors.  As the court in *In re L.A.-O.*
(2021) 73 Cal.App.5th 197 explained:  "*Caden C.* did not use the
words "parental role" in its analysis," and "[u]nfortunately, the
words 'parental role' standing alone, can have several different
meanings . . . .  [¶]  They can mean being a *good* parent—
nurturing, supportive, and guiding.  *Caden C.*, however, tells us
that the parental-benefit exception does not require being a good
parent; it does not require that the parent have overcome the
struggles that led to the dependency, and it does not require that
the parent be capable of resuming custody.  [¶]  These words can
also mean giving parental care, such as changing diapers,
providing toys and food, and helping with homework.  This would
conflict, however, with *Caden C.*'s warning that "rarely do

'[p]arent-child relationships' conform to an entirely consistent pattern." (*Id.* at p. 210; see *Caden C.,* at pp. 632, 634.)

Relying on *Katherine J., supra,* 75 Cal.App.5th 303 and *In re A.L., supra,* 73 Cal.App.5th 1131, the Department argues the court's use of the term "parental role" did not "signify" the court considered "any factors that were disallowed by *Caden C.*" *Katherine J.,* however, supports Pricillana, not the Department. The court in *Katherine J.* agreed with the court in *In re L.A.-O.,* explaining "problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it . . . ." (*Katherine J.,* at p. 319.) Moreover, as the court in *Katherine J.* succinctly stated: "*Caden C.* requires juvenile courts to do more than summarily state that a parent has not occupied a parental role in his child's life" (*ibid.*), which is exactly what the juvenile court stated here. The court in *Katherine J.* also concluded the juvenile court in that case did not err because, although the juvenile court ruled the father had "'not occupied a significant parental role,'" "[c]ritically" the juvenile court explained what it meant: The father's issues with substance abuse and violence prevented him from maintaining a strong, positive emotional attachment with his daughter. (*Id.* at pp. 319-320.) In contrast, the juvenile court here did not explain what it meant when the court stated Pricillana had not taken on a parental role.

*In re A.L., supra,* 73 Cal.App.5th 1131 does not support the Department either. The court in that case held the juvenile court did not err in considering, as part of its analysis of the parental-benefit exception, that the child's caregivers occupied a parental role. But, as the court in *A.L.* explained, the juvenile court in that case first determined the father "in fact had

13

satisfied the second component of the parental-benefit exception" because the juvenile court found that the "father was 'bonded with . . . his daughter,'" that he "'had shown exceptional devotion to [her],'" and that the daughter "'benefit[ted] from that attachment.'" (*Id.* at p. 1155.) The court in *A.L.* explained that, when a court analyzes the third element of the parental-benefit exception by weighing "the potential benefits that adoption would afford the minor against the potential harm of the loss of the relationship with the father," the "strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." (*Id.* at p. 1157.)[5]

In contrast, the juvenile court here did not find Jaylene had a positive, emotional attachment to Pricillana and then weigh "'the benefit of placement in a new, adoptive home'" against "'the harm [Jaylene] would experience from the loss of'" her relationship with Pricillana. (*Caden C.*, *supra*, 11 Cal.5th at

_____

[5]    While perhaps permitting such a consideration, *Caden C.* makes clear the juvenile court may not find the benefits of adoption outweigh the potential harm from severing the parent-child relationship *solely* because the caregiver occupies a greater "parental role." As the Supreme Court explained: "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

14

p. 633; see *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1158.) The juvenile court ruled the parental-benefit exception did not apply solely because Pricillana has not shown she had taken on a parental role, without explaining what the court meant by that term. That was error. (See *In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 211 [juvenile court erred in finding, without explanation, that the parents had "not acted in a parental role in a long time" and that prospective adoptive parents had been acting in that role]; *In re D.M.*, *supra*, 71 Cal.App.5th at p. 270 [juvenile court erred in "focusing on whether father occupied a 'parental role' in the children's lives" and "equating that role with . . . understanding their medical needs," where the court "said nothing about the attachment between father and his children"]; *In re J.D.*, *supra*, 70 Cal.App.5th at pp. 864-865 [juvenile court erred in making a "conclusory" finding "that mother's relationship with [the child] did not 'amount to a parental bond'" because it was unclear whether that finding "encompassed factors that *Caden C.* deems irrelevant"]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 ["juvenile court's references to . . . whether the parents occupied a 'parental role' or whether a 'parental relationship' existed are concerning because it is unclear what weight the juvenile court placed on these conclusions"].)

Citing evidence the caregiver had taken care of Jaylene for over two years, the Department argues the juvenile court was "well within its discretion to find that [Pricillana] did not prove the benefit of maintaining a relationship with her outweighed the benefits of permanence through adoption." This argument misses the mark. By failing to conduct a proper analysis on the second element, the court could not conduct a proper balancing inquiry

15

on the third.  While there may have been facts showing the benefits of adoption outweighed any harm that severing Jaylene's relationship with Pricillana would cause, there were also facts showing Jaylene would benefit if the relationship continued, namely, Jaylene's insistence throughout the proceedings that she missed her mother, that she wanted to live with her mother, and that she did not want to be adopted.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 ["courts often consider how children feel about, interact with, look to, or talk about their parents"]; *In re D.P.*, *supra*, 76 Cal.App.5th at p. 167 [that the children "loved [their mother], called her mom, ran to her when they started the visits, routinely asked when they would be coming home with her, and . . . were happier with her than with the caretakers" supported the juvenile court's finding that "the parent-child relationship was beneficial"].)  As one court has explained:  "We cannot know how the court would have exercised its discretion" on the third element "if it had the benefit of the *Caden C.* analysis when making its ruling."[6]  (*In re D.M., supra*, 71 Cal.App.5th 261, 271; see *In re J.D., supra*, 70 Cal.App.5th 833, 865 ["Because it is unclear whether and to what extent the juvenile court considered improper factors at the second step of its analysis, it is unnecessary to address whether there also was an abuse of discretion at the third step."]; *In re B.D.*, *supra*, 66 Cal.App.5th at pp. 1230-1231 [because "the juvenile court considered improper factors at the second step of the analysis . . . we need not address whether the juvenile court abused

---

[6]     Here, of course, the juvenile court had the benefit of *Caden C.*, which the Supreme Court decided long before the January 2022 selection and implementation hearing.  But the juvenile court did not apply *Caden C.*

16

its discretion in weighing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home"].)

As discussed, it is not clear how the juvenile court intended to rule on the first element of the parental-benefit exception, but it is clear the court committed error in analyzing the second element. (See *In re M.G.* (2022) 80 Cal.App.5th 836, 852 ["When a juvenile court bases its decision to terminate parental rights on improper factors, the trial court abuses its discretion."].) Therefore, we reverse the trial court's ruling and direct the court to conduct a proper analysis under the *Caden C.* framework.

> ### B.    *The Department and Juvenile Court Did Not Comply with the Requirements of ICWA*
>
> #### 1.    *Applicable Law*

"ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq.) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes" (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 316), including asking "each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77; see 25 C.F.R. § 23.107(a)). California law "'more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."'" (*J.C.*, at p. 77; see § 224.2, subd. (a); *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742.)

17

"Section 224.2 '"creates three distinct duties regarding ICWA in dependency proceedings."'" (*In re J.C., supra*, 77 Cal.App.5th at p. 77; see *In re H.V.* (2022) 75 Cal.App.5th 433, 437.) The first two are relevant here. "First, section 224.2, subdivision (b), requires the child protective agency to ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.'" (*J.C.,* at p. 77; see *H.V.*, at p. 437; Cal. Rules of Court, rule 5.481(a)(1).) Although this duty is "commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' (§ 224.2, subd. (a)) and continues throughout the dependency proceedings." (*J.C.,* at p. 77.) "Second, if the court or child protective agency 'has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child,' the court and the Department 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'" (*Id.* at p. 78; see § 224.2, subd. (e); *H.V.*, at p. 437; Cal. Rules of Court, rule 5.481(a)(4).)

"'""The juvenile court must determine whether . . . ICWA applies to the proceedings."' [Citation.] "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."'" (*In re J.C., supra*, 77 Cal.App.5th at p. 78;

18

see § 224.2, subd. (i)(2); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1050; Cal. Rules of Court, rule 5.481(b)(3).)  The court, however, may not "find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [child protective agency] inquiry that is not proper, adequate, or demonstrative of due diligence . . . ." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408; see *In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

### 2. *The Department Failed To Conduct, and the Court Failed To Ensure the Department Conducted, an Adequate Inquiry*

#### a. *The Inquiry for Pricillana's Family*

Before the Department filed its petition, a Department social worker questioned Pricillana about her possible Indian ancestry, and Pricillana said she did not know of any.  Pricillana subsequently filed an ICWA-020 Parental Notification of Indian Status form, in which she checked the box next to the statement, "I have no known Indian ancestry as far as I know."

A Department social worker had interviewed Pricillana's father, Mr. S., in 2011 for the dependency proceeding involving Pricillana's younger son.  Mr. S. explained he and his wife adopted Pricillana when she was three years old.[7]  A Department social worker again interviewed Mr. S. shortly before the Department filed the petition in this action, but did not ask him

---

[7]    Mr. S's wife, Pricillana's adoptive mother, died several years before the Department filed the petition in this action.

19

whether he had information about Pricillana's biological parents or other biological relatives.

Pricillana argues the Department did not comply with its duty of inquiry because it failed to ask Mr. S., as well as an aunt and uncle of Pricillana's whom Pricillana later identified, about possible Indian ancestry. The Department argues it did not have to ask any of these people about possible Pricillana's Indian ancestry because she was adopted.

The Department's understanding of its duty of inquiry under ICWA and section 224.2 is (yet again) wrong. The Department's duty goes beyond inquiring about possible Indian ancestry from biological relatives the Department happens to encounter. Rather, "the agency has a duty to gather information by conducting an initial inquiry," even though, and in part because, the parent "has no similar obligation." (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742; see *In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 317 ["The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families."]; *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["[t]he court and the agency must act upon information received from any source, not just the parent"].) Where, as here, the parent of a dependent child is adopted, the Department must at least make some effort to identify the biological parents, relatives, or "others who have an interest in the child" that are likely to have relevant information about possible Indian ancestry. (§ 224.2, subd. (b); see *In re J.C.*, *supra*, 77 Cal.App.5th at p. 80, fn. 4 ["That the mother . . . was adopted was all the more reason the Department should have followed up on an obvious lead to locate her biological parents."]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 552-

20

553 [child protective agency "failed to satisfy its duty to inquire . . . because it did not make meaningful efforts to locate and interview [the mother's] biological parents"]; *K.R.*, at p. 709 ["a social services agency has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status"].)

Nothing in the record suggests the Department made any effort to identify Pricillana's biological relatives. After Pricillana stated in her ICWA-020 form she had no known Indian ancestry, the Department did nothing to inquire about possible Indian ancestry from her side of the family—a failure we have repeatedly held violates a child protective agency's duty of inquiry. (See, e.g., *In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 81 ["Regardless of a parent's response concerning his or her possible Indian ancestry on the ICWA-020 Parental Notification of Indian Status form or when questioned by the court at the initial appearance, . . . section 224.2, subdivision (b), requires the agency to ask the child, the parents, extended family members and others who have an interest in the child whether the child is, or may be, an Indian child"]*; In re J.C., supra*, 77 Cal.App.5th at p. 79 ["[O]ther than obtaining the signed ICWA-020 forms (and perhaps asking [the mother] in her initial interview if she had any Indian ancestry), the Department made no . . . efforts at all. That was error."]) Most obviously, the Department easily could have asked the two most likely candidates, Pricillana and her adopted father, if they had any contact information for Pricillana's biological parents or other relatives. Similarly, the juvenile court failed to comply with its duty to ensure the Department conducted an adequate inquiry.

21

There is no indication the juvenile court ever asked about the Department's inquiry efforts for Pricillana's side of the family. (See *Rylei S.*, at p. 320; *In re J.C.*, *supra*, 77 Cal.App.5th at p. 79.)

        b.     *The Inquiry for Jaylene's Father's Family*

Pricillana identified Jack T. as Jaylene's father. Jack was incarcerated throughout the duration of the dependency proceedings. When asked at the detention hearing whether Jack had any Indian ancestry, Pricillana responded: "I don't think so, not too sure." The court subsequently ruled there was "no reason to know" ICWA applied.

An investigator for the Department mailed Jack an ICWA-020 form in March 2021, over a year after the Department filed its petition.[8] Jack returned a completed form, indicating that he, one of his ancestors, or Jaylene was or may be a member of the "Tuba City Apache Tribe" in Arizona. The Department sent Jack a letter asking him to identify his parents and grandparents, any family member he believed had Indian ancestry, and any other persons who could provide relevant information. Jack, however, did not respond. The Department also sent notices to several Apache tribes; those tribes that responded indicated Jaylene was not eligible for membership. At the selection and implementation hearing, the court found ICWA did not apply, observing that the Department sent notices to the tribes and none of them said Jaylene was eligible for membership.

---

[8]    The Department had previously mailed Jack notices of hearings. It is not clear from the record whether the Department mailed him an ICWA-020 form before March 2021.

Pricillana contends the Department failed to inquire about possible Indian ancestry from any of Jack's extended family members. She also contends that, after Jack said he and Jaylene may have Indian ancestry, the Department failed to conduct an adequate inquiry because all the Department did was send Jack "a single form letter that it never follow[ed] up on."

Whether the Department complied with its duty of inquiry for Jack's side of the family is a closer question than for Pricilla's side. Pricillana does not identify any specific family member or relative of Jack's whom she contends the Department should have asked about any Indian ancestry. The Department had limited success contacting Jack, who was incarcerated. And when the Department sent Jack a letter asking him to identify his biological parents and other people who may have relevant information, Jack did not respond.

Nevertheless, the Department should have done a little more and, because the Department will have to inquire further into possible Indian ancestry on Pricillana's side of the family, it will have an opportunity to complete its inquiry on Jack's side. The Department's duty was not limited to "what is sometimes (and somewhat inaccurately) referred to as the . . . initial duty of inquiry." (*In re Rylei S.*, *supra*, 81 Cal.App.5th at p.319.) Rather, after Jack indicated he and Jaylene had possible Indian ancestry, "the Department was obligated under section 224.2, subdivision (e), and rule 5.481(a)(4), to 'make further inquiry regarding the possible Indian status of the child' and to 'make that inquiry as soon as practicable.'" (*Ibid.*; see *In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 404 [grandmother's statement she had Cherokee ancestry through her grandmother triggered the duty of further inquiry, even though "she declined to provide

23

information about her grandmother and denied having further information"]; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 786 [mother's statement "her family was in part Red Tail Indian" triggered the child protective agency's duty of investigation].) While Jack's incarceration may have limited the Department's available methods of inquiry, the Department could have asked Pricillana whether she had contact information for any of Jack's family members (or tried again to follow up with Jack). While such efforts may have led "to a dead end" (*In re K.T.* (2022) 76 Cal.App.5th 732, 744), they would have ensured the Department did not fail to obtain potentially relevant information to share with the tribes about Jaylene's possible ancestry. (See *ibid.* [child protective agencies do "not discharge their duty of further inquiry until they make a 'meaningful effort' to locate and interview extended family members and to contact [the Bureau of Indian Affairs] and the tribes"].)

# DISPOSITION

The juvenile court's order terminating Pricillana's parental rights over Jaylene is reversed. The juvenile court's order terminating Pricillana's parental rights over Aliah is conditionally affirmed. The juvenile court is directed to determine whether the parental-benefit exception applies to Jaylene under the Supreme Court's framework in *Caden C.*, *supra*, 11 Cal.5th 614, and to ensure the Department complies fully with the inquiry and, if necessary, notice provisions of ICWA and related California law.


SEGAL, J.


We concur:



PERLUSS, P. J.



FEUER, J.

25