Filed 11/23/22  In re A.M. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | B318529 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.F., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP04315A-C) |

APPEAL from orders of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

———————————

S.F. (mother) appeals from the juvenile court's orders terminating parental rights over her three oldest children pursuant to Welfare and Institutions Code[1] section 366.26. Mother argues the juvenile court erred in failing to apply the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) or sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)) to the termination of parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I. Dependency referral and petition

Mother has three children that are the subject of these dependency proceedings: A.M. (born October 2010), J.M. (born March 2013), and E.O. (born July 2016). During the course of the proceedings, mother gave birth to two other children, R.F. and K.G. The current matter came to the attention of the Los Angeles Department of Children and Family Services (DCFS) in mid-2018 based on referrals alleging drug abuse and domestic violence by mother. At the time, mother was homeless, and the children were not living under her care. A.M. and J.M. were staying with their paternal grandmother, and E.O. was residing with the maternal grandmother. The maternal grandmother

---

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2] A portion of the factual and procedural background is taken from this court's prior opinion in *In re A.M.* (May 24, 2022, B313363) [nonpub. opn.]. On our own motion, we take judicial notice of this prior opinion. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

was in the process of seeking temporary legal guardianship of all three children.[3]

In July 2018, DCFS filed a dependency petition on the children's behalf. The petition alleged that mother was a current abuser of marijuana which rendered her incapable of providing regular care and supervision to the children, and that she was the perpetrator of an act of domestic violence against the children's maternal grandfather. DCFS later amended the petition to add allegations that mother was also a current abuser of methamphetamine, that E.O.'s father had a history of marijuana and methamphetamine abuse, and that mother had a history of engaging in domestic violence with each child's father.

At a July 12, 2018 detention hearing, the juvenile court ordered the children detained from mother. All three children were placed with the maternal grandmother under supervision of DCFS. The matter was set for an adjudication hearing.

## II. Jurisdiction and disposition hearings

Due to several continuances, the dependency petition was not adjudicated until October 2019. Over the course of 2019, DCFS provided the juvenile court with various reports on mother's progress in addressing her substance abuse issues. As of February 2019, mother was residing in a shelter for homeless pregnant women. While at the shelter, mother was required to work, to remain sober, to participate in a 12-step drug recovery program, and to attend a health and education program.

---

[3] As of 2018, the father of A.M. and J.M. was no longer residing in the United States, and did not have regular contact with his children. E.O.'s father did not have any contact with his child and his whereabouts were unknown. Neither father is a party to this appeal.

Although mother previously had been enrolled in an outpatient drug treatment program, she left in early 2019 because her long commute made it difficult for her to participate in services. While in the program, mother tested positive for methamphetamine, and she admitted to a counselor that she used the drug with the father of the child she was expecting. Between October 2018 and January 2019, mother missed almost all of her scheduled drug tests.

By August 2019, mother had completed a new outpatient drug treatment program. The following month, however, she was asked to vacate the shelter where she had been residing with her fourth child for repeatedly violating the program rules. The director of the shelter noted that mother's sobriety did not appear to be a main concern for her, and that she often refused to attend required meetings because she claimed she was too busy.

At the jurisdiction hearing held on October 10, 2019, the juvenile court sustained an amended petition under section 300, subdivisions (b) and (j). The court found true the allegations that mother was a recent abuser of marijuana and methamphetamine, that E.O.'s father had a history of drug abuse and was a frequent user of marijuana and methamphetamine, and that mother and E.O.'s father had a history of engaging in violent physical altercations in the children's presence. The matter was continued for a disposition hearing.

As of November 2019, the children continued to reside with the maternal grandmother in Los Angeles County. The paternal grandmother of A.M. and J.M., also lived nearby and assisted in providing the children with a safe and stable home environment. Mother had chosen to sublet a room in a two-bedroom apartment in Orange County. She had custody of her fourth child, R.F., and

4

told DCFS that her goal was to reunify with her three older children. Mother acknowledged, however, that her current housing could not accommodate all four children, and that she would be overwhelmed if the children were returned to her care at once. Although DCFS had requested that she submit to another random drug test, mother failed to comply.

In December 2019, the children were removed from the home of the maternal grandmother and placed in the home of A.M. and J.M.'s paternal grandmother. The change in placement was made because the maternal grandmother was having difficulty in her relationship with the maternal grandfather, who was engaging in erratic and self-harming behavior. Around this time, Mother notified DCFS that she had moved back to Los Angeles County and was living with the maternal grandmother. Mother had a recent positive test for methamphetamine, and admitted that she had relapsed. She reported that she was planning to re-enroll in an outpatient drug treatment program.

At the disposition hearing held on January 15, 2020, the juvenile court declared each of the children dependents under section 300, subdivisions (b) and (j), and ordered them removed from parental custody. The parents were granted family reunification services and monitored visitation with the children. Mother's court-ordered case plan included participation in a full drug rehabilitation program with weekly random drug testing, a 12-step program, a domestic violence support group, parenting education, and individual counseling to address case issues, child safety, and mutual domestic violence.

### III. Termination of family reunification services

As of July 2020, the children continued to reside with A.M. and J.M.'s paternal grandmother, and were thriving in her home.

Mother had regular visits with the children and daily telephone contact. Although mother had enrolled in an inpatient drug rehabilitation program following the disposition hearing, she was later discharged from the program for engaging in a romantic relationship with another resident. She then relocated to a sober living facility, and told DCFS that she intended to enroll in an outpatient drug treatment program, but forgot to attend her intake appointment. Between March and June 2020, mother had 10 negative drug tests and four missed tests. She was attending online 12-step meetings, but had not enrolled in a domestic violence support group, a parenting education program, or individual counseling. Additionally, none of the children's fathers had made any effort to participate in reunification services. Based on the parents' lack of compliance with their case plans, DCFS recommended that family reunification services be terminated.

As of September 2020, mother was pregnant with her fifth child and residing in an emergency maternity shelter in Orange County. She admitted to DCFS that the father of this child also had a long history of substance abuse. Mother had since enrolled in another outpatient drug treatment program, was attending parenting education classes, and had completed individual counseling. She had not yet enrolled in a domestic violence support group, and was unable to attend in-person 12-step meetings due to the shelter's COVID-19 restrictions. Mother had two missed drug tests in July 2020, and tested negative for drugs in her other tests. Although mother maintained monitored visitation with the children, the paternal grandmother reported that there were times when the children would become upset at

6

mother and refuse to participate in the visits. DCFS continued to recommend that family reunification services be terminated.

At a status review hearing held on October 22, 2020, the juvenile court found that the parents' progress in addressing the causes that necessitated removal of their children had not been substantial. The court terminated reunification services for each parent, and set the matter for a permanency planning hearing pursuant to section 366.26.

## IV.   Mother's section 388 petition

In its section 366.26 report filed in February 2021, DCFS identified adoption as the permanent plan goal for the children. The agency noted that the children had been residing with the paternal grandmother of A.M. and J.M. since December 2019. The paternal grandmother was providing the children with a safe and nurturing environment, and she had expressed to DCFS that she wished to adopt them. The children were closely bonded with the paternal grandmother and appeared to be thriving in their prospective adoptive home. The children's half-sibling, R.F., also had been placed with paternal grandmother after being removed from mother's care. Mother had monitored visits with the children every Saturday afternoon, and no recent concerns about the visits had been reported.

On February 18, 2021, the date set for the permanency planning hearing, mother filed a section 388 petition. She alleged that circumstances had changed in that she had completed a full drug and alcohol rehabilitation program, and continued to produce negative drug test results. She also had completed programs in domestic violence, parenting education, and individual counseling. In support of her petition, mother attached documents showing her successful completion of her

7

various court-ordered programs, including a drug and alcohol rehabilitation program in December 2020. Mother requested that the juvenile court reinstate her reunification services, grant her unmonitored visits with the children, and set the matter for a three-month progress review to assess the return of the children to her care. The court ordered a hearing on mother's petition.

In an interim review report filed in March 2021, DCFS stated that mother was residing with her fifth child, K.G., at an emergency maternity shelter, and was on a waiting list for permanent supportive housing. Although mother had been granted overnight visits with the child, R.F., those visits took place at the maternal grandmother's home due to the shelter's COVID-19 protocols. In a March 2021 interview with DCFS, mother reported that she was participating in weekly aftercare services, was regularly attending 12-step meetings, and had started individual therapy. According to mother, she had been diagnosed with bipolar depression with anxiety, and had begun taking prescribed psychotropic medication.

In its report, DCFS expressed concern about some of mother's recent Facebook posts. In February 2021, mother wrote, "Why does it only feel right when I[']m doing wrong?" Then, in March 2021, she wrote, "I only feel right when I'm doing wrong. I really dislike my life. I am not ok with myself and I'm struggling so much. I'm so tired of pretending that I'm making it through but I'm not. I'm fighting so many demons and right now they're all winning." Yet when DCFS asked mother if she was having difficulty with depression, she denied any recent concerns.

In her interview with DCFS, mother reported that K.G.'s father would be able to assist her with caring for the children if she was able to reunify with them, and that she wanted them to

be a family. When DCFS pointed out that K.G.'s father was also in the process of drug rehabilitation, mother acknowledged that he would need to complete his program first. DCFS further noted that K.G.'s father had implied in a recent Facebook post that he was having an overnight visit with mother and K.G., even though mother was not permitted to reside with the father or to monitor his visits.

For its March 2021 report, DCFS also interviewed the children about mother's section 388 petition. A.M. stated that she liked living with the paternal grandmother, but she wanted to return to mother. When asked why, A.M. replied that the neighborhood children were mean and did not play with her. J.M. stated that he wanted to stay with the paternal grandmother because he did not spend a lot of time with mother, and he did not like it when mother argued with the maternal grandmother during one of the visits. When asked how he would feel if mother was given another chance to have him in her care, J.M. answered, "I don't want to." E.O. also stated that he wanted to remain with the paternal grandmother because he "like[s] it here."

In their interviews with DCFS, the paternal grandmother and a paternal aunt shared their concern that mother was not being forthcoming with the agency about her struggles. The aunt further reported that she had overheard a recent telephone conversation between mother and the children in which mother urged the children to cry and beg the social worker that they wanted to live with her. DCFS also spoke with mother's case manager at the emergency shelter, who expressed concern about mother continuing a relationship with K.G.'s father while he was

still in recovery. In its report, DCFS recommended that the juvenile court deny mother's section 388 petition.

As of April 2021, mother was visiting the children at the maternal grandmother's home three hours per week. Mother stated that she enjoyed spending time with the children, and would bring crafts to the visits in order to engage them in activities. Mother also would cook for the children and watch movies with them. All three children expressed that they enjoyed their visits with mother. A.M. added that she missed mother, and J.M. said that he wished mother would visit him more often. The maternal grandmother, who served as the monitor for the visits, observed that mother was appropriate and attentive toward the children.

DCFS reported that the children continued to thrive in the paternal grandmother's home, and that she remained committed to adopting them. The paternal grandmother was loving and nurturing toward the children and able to meet all of their needs. The children had conveyed that they were happy residing with the paternal grandmother while being able to visit with mother.

In an interim review report filed in May 2021, DCFS continued to recommend that the juvenile court deny mother's section 388 petition. While acknowledging that mother had made significant progress in completing her court-ordered programs, DCFS expressed concern that mother still lacked insight into the issues that had led to the children's removal from her care. DCFS also noted that the children were stable in their placement, had a strong bond with the paternal grandmother, and had disclosed that they wished to remain in the paternal grandmother's home.

**V.    Hearing on mother's section 388 petition**

On May 6, 2021, the juvenile court held the hearing on mother's section 388 petition.  The children's maternal aunt testified that both she and the maternal grandmother were always present for mother's visits with the children.  Mother would bring arts and crafts to the visits, play with the children, and prepare food for them.  The children were excited at the start of the visits and were upset when the visits ended.  The maternal aunt had not observed mother to be under the influence of drugs during the visits.

Mother testified that the children enjoyed spending time with her and consistently asked for their visits to be extended.  The children would play with mother during the visits, and they were closely bonded with their younger siblings.  While mother acknowledged that she had written the Facebook posts about her emotional struggles, she explained that the posts were her way of reaching out for help on difficult days.  She was also taking medication and meeting with a psychiatrist and a therapist on a regular basis.  Mother had developed healthier coping skills through therapy, and she had a strong support system, which included her sponsor, maternal relatives, and K.G.'s father.  Although mother was aware that K.G.'s father had written a Facebook post about an overnight visit with mother and K.G., she denied that any such visit had occurred.  She also denied that she ever told the children what to say to the social worker.  Mother was currently residing in a communal living shelter that provided one bedroom per family and could accommodate the children with bunk beds if they were returned to her care.  Mother also recently had been approved for low income housing,

and she planned to start looking for an apartment in the near future.

The juvenile court denied the section 388 petition. The court found that mother had shown changed circumstances in that she completed her case plan, but that the reinstatement of her reunification services was not in the children's best interest. The court noted that the children had been in the care of their grandparents for a number of years, and during that time, mother had not been involved in their lives in any meaningful way. Instead, mother occupied the role of a "three-hour mom." The court concluded, "Although I commend the mom for doing everything she is doing and I'm super proud of her, I just don't think I can find that it's in the minors' best interest to grant the 388. Now I'm going to say this again. That does not mean that I will not hear another 388 in the future. But for right now, the court has to deny it." While denying mother's petition, the court ordered that her visits with the children be increased to a minimum of six hours per week. Over DCFS's objection, the court also liberalized the visits to include unmonitored visits at mother's shelter.

## VI. Section 366.26 permanency planning hearing

As of June 2021, mother was participating in unmonitored visits with the children at her shelter twice a week from 2:00 p.m. to 7:00 p.m. She also continued to have monitored visits each Saturday at the maternal grandmother's home. Mother reported to DCFS that she enjoyed bringing the children to the shelter because she could spend time with them "without feeling like someone has to be 'watching them.' " She further stated that the children loved visiting her because they had made friends with other children at the shelter. According to mother, she would

12

play outside with the children and cook for them during their visits. The children similarly expressed that they enjoyed visiting mother because she would cook for them, and they could play with other children at the shelter and spend time with their youngest sibling. Mother's case manager, however, had some concerns about the visits because she had observed that mother would spend a lot of time in her bedroom while the children played outside with other children and mothers. The case manager also reported that mother appeared to be having a difficult time, in part, because she was worried about a recent drug test, and she was not used to caring for five children on her own. Mother tested positive for marijuana in June 2021. Although mother claimed she had accidentally ingested the marijuana by eating a brownie, the staff at the shelter were not convinced.

In a status review report filed in October 2021, DCFS stated that the children continued to thrive in the care of the paternal grandmother. All three children had been receiving mental health services and meeting their therapeutic goals. While the therapy for J.M. and E.O. recently had terminated, A.M. continued to receive services and was working on her coping skills. Because mother was no longer residing at the shelter, she was solely having monitored visits with the children at the maternal grandmother's home. Mother stated that she enjoyed spending time with the children. She would bring crafts to the visits, cook for the children, and watch movies with them. The maternal grandmother confirmed that she was present to monitor the visits, but that mother tended to all of the children's needs.

A.M. reported that she enjoyed visiting with mother and spending time with her youngest sibling. She also stated that she was happy living with the paternal grandmother, but she missed mother. J.M. told DCFS that he liked living with the paternal grandmother and visiting with mother, but he wished mother would visit more often. E.O. similarly stated that he liked living with the paternal grandmother and visiting with mother.

In its report, DCFS noted that the paternal grandmother continued to provide a nurturing and safe home environment for each of the children. The children appeared to be doing well in school, and were observed to be well-loved and cared for in their prospective adoptive home. The children also reported that were happy residing with the paternal grandmother while still being able to visit with mother. The paternal grandmother expressed that she encouraged appropriate visitation between mother and the children, and that she was committed to adopting all three children. DCFS continued to recommend the children remain suitably placed in the paternal grandmother's home with adoption as the permanent plan goal.

In October 2021, mother's youngest child, K.G., was detained from mother after mother tested positive for cocaine. As of November 2021, mother continued to have monitored visits with the three eldest children every weekend from 10:00 a.m. to 6:00 p.m. The maternal grandmother reported that the visits were going well. Although mother consistently attended the visits, she told the social worker that she felt the children were indifferent to her when they returned from a trip to Mexico in October 2021. The social worker also observed that the children did not appear to have a strong bond with mother.

DCFS reported that, as of November 2021, the paternal grandmother of A.M. and J.M. remained committed to adopting all three children and providing them with a permanent home. DCFS reiterated that the paternal grandmother had been involved in caring for each of the children from early on in their lives, and that the children had developed a meaningful and significant relationship with her. DCFS again recommended that the juvenile court terminate parental rights and order adoption as the permanent plan.

The section 366.26 permanency planning hearing for A.M., J.M., and E.O. was held over a three-day period, commencing on December 1, 2021 and concluding on December 17, 2021. In addition to admitting the various reports filed by DCFS, the juvenile court heard the testimony of mother. Mother testified that she had unmonitored visits with the children at her shelter from May to July 2021. After mother left the shelter on July 23, 2021, she returned to having only monitored visits at the maternal grandmother's home every Saturday from about 12:30 p.m. to 6:30 p.m. During her visits with the children, they would cook dinner together, watch movies, play laser tag, and do arts and crafts. Mother also would help the children with their school work. On one occasion, A.M. talked to mother about an issue that the child was having with online bullying. In addition to these weekly in-person visits, Mother had FaceTime calls with the children on a daily basis. The children would call her "mom" or "mommy" during their visits, and were sad when they had to leave.

Mother testified that she had monitored overnight visits with her two youngest children, R.F. and K.G. While K.G. was currently in a foster home, R.F. had been placed with the

paternal grandmother of A.M. and J.M. in the same home as his three older half-siblings. All five children would be present during mother's weekly monitored visits at the maternal grandmother's home. Mother also testified that the three older children were closely bonded with both R.F. and K.G., and that the children would be "devastated" if they could not have a relationship with their younger siblings. Mother further stated that the older children seemed to prefer spending more time with K.G. than with her during their visits. On cross-examination, mother acknowledged she had not had A.M., J.M., or E.O. in her care since 2017.

Mother's counsel asked the juvenile court not to terminate mother's parental rights over her three older children based on the statutorily recognized exceptions for a beneficial parental relationship and a sibling relationship. Her counsel argued that mother had maintained regular visitation with the children throughout the proceedings, that the older children were closely bonded with both mother and their younger siblings, and that the children would be substantially impacted if they could not continue those relationships. The children's counsel and county counsel joined in requesting that parental rights be terminated. The children's counsel noted that the children had not been in mother's care for several years, and that mother had never made sufficient progress in her case plan to obtain more liberalized visitation. Both the children's counsel and county counsel also asserted that the children did not have a strong enough bond with either mother or their younger siblings such that they would suffer detriment if those relationships were severed.

The juvenile court found by clear and convincing evidence that the children were adoptable. The court also found that

16

mother had not met her burden of proving that either the beneficial parental relationship exception or sibling relationship exception applied to the termination of her parental rights. While acknowledging that it was a difficult decision, the court noted that mother had a long history of substance abuse, and that the children had spent the majority of their lives outside of her care due to her repeated drug relapses. With respect to the children's sibling relationship, the court explained that four of the five children were currently residing with the paternal grandmother in the prospective adoptive home, and that it was likely the children "are always going to remain in contact with each other." With respect to mother's relationship with the children, the court stated, in relevant part: "I will indicate that mom has continued to visit them once a week, and she has continued to FaceTime them during the week, but I don't believe that she has really established a parental role. These children have been with their grandparents for years. Those grandparents are in their lives every single day. . . . [¶] The children know that this is mom, but mom has been coming in and out of their lives for so many years now, and they deserve permanency. They deserve to know where they stand in this world." The court terminated parental rights over A.M., J.M., and E.O., and ordered adoption as the children's permanent plan.

Mother filed a timely appeal.

## DISCUSSION

On appeal, mother challenges the juvenile court's orders terminating parental rights over A.M., J.M. and E.O. Mother specifically contends the court erred in finding that she had failed to establish that either the beneficial parental relationship exception or the sibling relationship exception applied to the

17

termination of parental rights. We find no abuse of discretion in the juvenile court's ruling.

## I. Beneficial Parental Relationship Exception

At a hearing under section 366.26, the juvenile court must select and implement a permanent plan for a dependent child, with the express purpose of providing the child a "stable, permanent" home. (§ 366.26, subd. (b).) Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1).) For the juvenile court to implement adoption as the permanent plan, it must find, by clear and convincing evidence, that the child is likely to be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) Then, in the absence of evidence that a relative guardianship should be considered, or that the termination of parental rights would be detrimental to the child under one of six enumerated exceptions, the juvenile court "shall terminate parental rights." (§ 366.26, subd. (c)(1).) As our Supreme Court has observed, these " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parental relationship exception applies when the juvenile court determines that the termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." In *Caden C., supra,* 11 Cal.5th at p. 636, our high court explained that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must

18

show regular visitation and contact with the child, taking into account the extent of visitation permitted.  Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."

We generally review the first two elements for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)  However, where the issue on appeal turns on a parent's failure to meet his or her burden of proof in a proceeding before the juvenile court, the question for the reviewing court becomes whether the evidence compels a finding in favor of the parent as a matter of law.  (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 782 (*Elizabeth M.*); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  The third element is reviewed for abuse of discretion.  (*Caden C.*, at p. 640.)  Under this standard, the reviewing court will find an abuse of discretion "only when ' " 'the [juvenile] court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

In this case, even assuming that mother established the first and second elements of the beneficial parental relationship exception, we conclude the juvenile court did not abuse its discretion in finding that mother failed to establish the third element.  In evaluating the third element – whether termination of parental rights would be detrimental to the child – the court must determine whether "the benefit of placement in a new,

19

adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship' " with the parent. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id*. at p. 634.)

Here, the record reflects that the juvenile court carefully engaged in this weighing process in finding that the parental benefit exception did not apply. The court identified a number of factors that it considered:  the age of each of the children; the significant length of time the children had been out of mother's care; the fact that mother's visits had remained monitored due to her repeated drug relapses; the extent to which the children were bonded with their long-term caregivers; and the children's need for permanency and stability. At the time of the permanency planning hearing, the children had been out of mother's care for at least four years and had spent the majority of that time residing with the paternal grandmother in their prospective adoptive home. Even before DCFS became involved with the family, the children had been staying with the paternal and maternal grandparents because of mother's ongoing substance abuse issues. The juvenile court recognized that mother had maintained regular contact with the children, and that the children enjoyed visiting mother and engaging in fun activities with her. The court also acknowledged that the monitored nature of the visits limited mother's access to the children, and thus, affected her ability to develop a stronger bond with them. As the court observed, however, mother was unable to sustain more liberalized visitation due to her continual lack of sobriety

20

over the course of the proceedings, which in turn prevented her from taking on a more meaningful role in the children's lives.

The record further reflects that the children were closely bonded with the paternal grandmother and were thriving in her care. While each of the children had expressed that they liked visiting with mother, they also conveyed that they were happy living in the paternal grandmother's home. The paternal grandmother was committed to adopting all three children and providing them with a stable and permanent home. Moreover, although the evidence showed that the children derived some benefit from spending time with mother, the social worker had observed that they did not appear to share a strong bond with her. Mother's case manager at the shelter also had concerns about a perceived lack of attachment between mother and the children and noted that mother tended to spend a lot of time in her bedroom during the visits while the children played outside. Shortly before the permanency planning hearing, Mother herself acknowledged to DCFS that she felt the children were indifferent to her. On this record, the juvenile court reasonably could find that the benefits to the children in receiving a permanent home outweighed any detriment that might result from the loss of the relationship with mother. (See *In re Katherine J.* (2022) 75 Cal.App.5th 303, 321–322 [although father and child "maintained a warm and loving relationship," substantial evidence supported finding that "father's failure to resolve the substance abuse and violence issues that led to and existed throughout [the child's] five-year odyssey in dependency court diminished any benefits she derived from a continuing relationship with him"]; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1159 (*A.L.*) [juvenile court did not abuse its discretion in finding that benefits the child derived from

father's consistent and positive visits "did not outweigh the benefits the child would receive from adoption and 'being in a structured, loving home environment [with people] who are committed to providing permanency' "].)

Mother argues that the juvenile court largely focused on her struggles with substance abuse and failure to reunify with the children in finding that the parental benefit exception did not apply. Although a parent's "continued struggles with the issues leading to dependency are not a categorical bar to applying the exception" (*Caden C.*, *supra*, 11 Cal.5th at p. 637), they may "speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent." (*Id.* at p. 638.) The parent's continuing difficulty with mental health or substance abuse, however, "may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Ibid.*) Here, as discussed, mother's substance abuse issues were relevant to the strength and quality of her relationship with the children and the consequences of severing that relationship in favor of adoption. (See *A.L.*, *supra*, 73 Cal.App.5th at p. 1159 ["evidence that father's prior substance abuse had negatively impacted the minor was germane to the court's assessment of ' "the strength and quality" ' of the parent-child relationship"].) The record does not show that the juvenile court based its detriment finding on mother's continual struggles with substance abuse, or otherwise used such struggles to assign blame or make any moral judgments about her fitness.[4]

_____

[4] During the juvenile court's detailed remarks about why the parental benefit exception did not apply, the court made a

Mother also asserts that the juvenile court erred because it stated that mother had failed to establish a "parental role" in finding that the parental benefit exception did not apply. Since the Supreme Court's decision in *Caden C.*, some appellate courts have concluded that a juvenile court may not rely on a parent's failure to occupy a parental role in the child's life in determining whether there is a beneficial parent-child relationship. (See, e.g., *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210–211; *In re J.D.* (2021) 70 Cal.App.5th 833, 864–865; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) While the *Caden C.* court explained that it is improper to compare "the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" in evaluating the parental benefit exception, the court did not state that it is improper to describe the type of bond that the exception requires as parental in nature. (*Caden C.*, *supra*, 11 Cal.5th at p. 634; see *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1157.) Indeed, in many cases, as in this one, the term "parental"

---

passing comment that "I don't know how these children are going to benefit from mom having further services with them." As Mother points out, at the section 322.66 hearing, the question before the court is not whether the parent may resume custody of the child or receive additional reunification services. Thus, while it appears the juvenile court misspoke in referring to "further services," this isolated remark does not show that the court misapplied the law. Rather, when the juvenile court's statements at the hearing are considered as a whole and in context, it is clear the court understood that the reunification period had ended, and that the issue before it was whether mother had met her burden of establishing an exception to the termination of parental rights. Indeed, as the court expressly noted at the hearing, "We're not at reunification services anymore. We're at what is best for the children."

simply is shorthand for the type of substantial, positive, emotional bond that must exist for the exception to apply. As such, "the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." (*In re A.L.*, at p. 1157.) On this record, the juvenile court's use of the term "parental role" in considering the strength and quality of mother's relationship with the children was not improper.

In sum, the totality of the record shows that the juvenile court carefully weighed the benefits to the children in receiving a permanent adoptive home against any detriment to them resulting from the termination of the parental relationship. Based on the evidence before it, the court reasonably could find that mother had failed to establish that her relationship with the children was "so important to [them] that the security and stability of a new home wouldn't outweigh its loss." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The juvenile court accordingly did not err in determining that the beneficial parental relationship exception did not apply.

## II.    Sibling Relationship Exception

Section 366.26, subdivision (c)(1)(B)(v) sets forth a separate exception to the termination of parental rights where the juvenile court determines that the termination would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship." The court undertakes a two-step analysis in evaluating the applicability of the exception. First, the court is directed "to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house,

24

shared significant common experiences or have existing close and strong bonds.  [Citation.]  If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 951–952; accord, *In re D.O.* (2016) 247 Cal.App.4th 166, 173-174.)

The purpose of the sibling relationship exception "is to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.' " (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.)  " 'To show a substantial interference with a sibling relationship the parent . . . must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child.  Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship.' " (*Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 781.)  In deciding whether the exception applies, the juvenile court also may consider other factors not expressly identified in the statute, "such as a proven history of, and expressed commitment to, sibling visits." (*In re D.O.*, *supra*, 247 Cal.App.4th at p. 175.)  However, the exception must be "evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings." (*Id.* at p. 174.)

The juvenile court's decision that a parent has not met his or her burden of proving the sibling relationship exception applies "may be based on either or both of two component

determinations—whether a beneficial sibling relationship exists and whether the existence of that relationship constitutes 'a compelling reason for determining that termination would be detrimental to the child . . . .' [Citations.] When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. [Citations.] When the juvenile court concludes the benefit to the child derived from preserving the sibling relationship is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion." (*Elizabeth M., supra*, 19 Cal.App.5th at pp. 781–782.)

In finding that mother had not met her burden of proving that the sibling relationship exception applied, the juvenile court reasoned that the four oldest children were currently living in the paternal grandmother's home and were likely "going to end up together." The court further stated that, while the youngest child, K.G., was in a different home, it was likely that there would be sibling visits, and thus, that the children would "remain in contact with each other." As mother points out, the juvenile court did not explicitly address whether A.M., J.M., and E.O. had a significant relationship with the youngest sibling, K.G. However, even assuming that mother established existence of a significant sibling relationship, the juvenile court reasonably could find that any benefit the children would receive from preserving the relationship with K.G. was not sufficiently compelling to outweigh the benefits achieved from adoption.

As the DCFS correctly asserts, the three oldest children never resided in the same household as K.G. At the time of

26

K.G.'s birth, the children had been removed from mother's care, and been residing with the paternal grandmother for several years. Because they never lived together as a family unit, the children did not share any significant common experiences with K.G. or have an existing close bond with him. Moreover, while mother testified the children would be "devastated" by the loss of the sibling relationship, the evidence showed the children's contact with K.G. primarily had consisted of weekend visits between mother and all five children. During the visits, the children would play with K.G. and try to include him in their games and activities. However, the evidence failed to establish that any benefit the children may have derived from these limited friendly interactions with K.G. outweighed the benefits they would receive through adoption. (See *Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 783 [juvenile court did not abuse its discretion in finding that permanence of adoption outweighed benefit of continuing sibling relationship where children had not resided in same home as their siblings for 16 months and were thriving in their current stable placement]; *In re D.O.*, *supra*, 247 Cal.App.4th at p. 177 [no prejudicial error in finding sibling relationship exception did not apply where two-year-old child spent only first year of her life with her siblings and then visited them only twice a month during her second year].)

On this record, the juvenile court reasonably could determine that mother had failed to prove that the children's interest in continuing their relationship with K.G. outweighed the sense of security and belonging that a permanent adoptive home would provide. The court therefore did not err in finding that the sibling relationship exception did not apply and that parental rights over A.M., J.M., and E.O. should be terminated.

27

**DISPOSITION**

The juvenile court's orders terminating parental rights over A.M., J.M., and E.O. are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


RICHARDSON (ANNE K.), J.*


We concur:



LAVIN, Acting P. J.



EGERTON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.